163 N.J. Super. 139 (1978)
394 A.2d 377
ELIZABETH WESTPHAL, AS EXECUTRIX OF THE ESTATE OF WILLIAM WESTPHAL, DECEASED, AND ELIZABETH WESTPHAL, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
LAWRENCE A. GUARINO, M.D., MURRAY WAGMAN, M.D., DOMINICK A. SCIALABBA, M.D., STUART J. FRIEDMAN, M.D., AND JOHN F. KENNEDY COMMUNITY HOSPITAL, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1977.
Decided January 12, 1978.
*141 Before Judges LORA, SEIDMAN and MILMED.
Mr. Franklin M. Sachs argued the cause for appellant (Messrs. Podvey & Sachs, attorneys; Ms. Kathleen Moran on the brief).
Mr. John Z. Jackson argued the cause for respondent Murray Wagman (Messrs. Shanley & Fisher, attorneys).
Mr. Robert D. McDonough argued the cause for respondents Dominick A. Scialabba and Stuart J. Friedman (Messrs. McDonough, Murray & Korn, attorneys).
PER CURIAM.
Plaintiff Elizabeth Westphal, individually and as executrix of the estate of her deceased husband, instituted a medical malpractice suit against four physicians, Lawrence A. Guarino, Murray Wagman, Dominick A. Scialabba and Stuart J. Friedman, and the John F. Kennedy Community Hospital, alleging that their negligence *142 in failing to make a correct diagnosis resulted in the death of her husband. A pretrial motion for summary judgment made on behalf of Dr. Guarino was granted. At the commencement of the trial plaintiff voluntarily dismissed the complaint as against the hospital with prejudice. The trial proceeded against the remaining defendants and resulted in a verdict of no cause of action. Plaintiff appealed the resultant judgment.
The single issue raised on appeal (though divided into two points in plaintiff's brief) is whether the trial judge clearly abused his discretion to the prejudice of plaintiff by refusing to relax R. 4:17-7 so as to permit plaintiff's medical experts to testify.
In January 1972 plaintiff's husband developed chills, headache and nausea. He was treated by Dr. Wagman, who diagnosed the ailment as severe influenza. When decedent failed to respond to treatment and later developed a high fever, Dr. Wagman caused him to be admitted to John F. Kennedy Community Hospital on February 6. The patient remained there until March 23, when Dr. Howard Z. Joselson, engaged by plaintiff in replacement of Dr. Wagman and the specialists who had been treating her husband, had him transferred to East Orange Hospital, where he came under the care of Dr. Howard E. Medinets, a neurologist. Death occurred on March 29, 1972.
Plaintiff sought to establish at the trial that Drs. Scialabba and Friedman, neurologists who performed spinal taps on her husband at the John F. Kennedy Community Hospital, erroneously concluded that he was suffering from a subarachnoid hemorrhage, whereas in fact the illness was a bacterial infection. The death certificate gave the cause of death to be "cerebral infarction, due to brain abscess, due to meningitis," but a later autopsy revealed no indication of meningitis. Dr. Joselson, testifying for plaintiff, expressed the opinion that Dr. Wagman had deviated from accepted medical standards by giving decedent an antibiotic which probably would not have helped the condition and which *143 masked the growth of the bacterial infection, and that Drs. Scialabba and Friedman deviated from those standards by misreading the spinal taps and thus failing properly to diagnose the illness as a bacterial infection.
Defendants produced Dr. Medinets who, in response to a hypothetical question, said that the diagnosis of subarachnoid hemorrhage was correct, that Dr. Wagman's initial use of antibiotics was beneficial, and that none of the defendants had deviated from accepted standards of medical care.
Plaintiff argues that the exclusion of her proposed expert medical witnesses compelled her to go to trial only with the medical testimony of Dr. Joselson, whom she had not intended to use to prove negligence or proximate cause. She submits that it was "unjust to compel a plaintiff to try a medical malpractice case without competent and prepared expert witnesses."
The testimony of the proposed experts, Dr. James Zimmerly and Dr. Bernard Sussman, was barred on defendants' motion at the outset of the trial because their names had not been supplied and their reports not furnished to defendants within 20 days of the first date fixed for trial, as specified in R. 4:17-7. The trial judge refused to relax the rule because of plaintiff's failure to move in advance for said relief. He was of the view that defendants, having objected to the lateness of the names and reports, were under no burden to go forward despite their objection and take depositions of the experts.
Dr. Wagman's interrogatories relating to expert witnesses, propounded in April 1974, were answered merely by inserting "H. Joselson." and "To be provided." The response to those submitted by Drs. Scialabba and Friedman was "To be supplied."
The case was first listed for trial in April 1975. It was adjourned at that time and also in November of that year because depositions of the defendant physicians were still outstanding. During this time defendants Scialabba and Friedman served on plaintiff a copy of a report by a Dr. *144 Smith, whom they intended to use as an expert, and advised that the opinion of Dr. Medinets, who had agreed to appear as an expert witness, was substantially in accord with that of Dr. Smith.
A third trial date of January 2, 1976 was postponed because the depositions of Drs. Wagman and Friedman were still incomplete. A further adjournment until March 15, 1976 was granted at Dr. Wagman's request.
On January 22, 1976 defendants were advised by letter that plaintiff's interrogatories were being amended to name Drs. Zimmerly and Sussman as expert witnesses. The letter stated that the witnesses, having reviewed the records, would testify that the care and treatment rendered by defendants "was inadequate, did not meet the standards existing in the community, and that this inadequate care and treatment caused the decedent's condition to deteriorate and caused him to ultimately expire." Defendants were also informed that as soon as the depositions of Drs. Wagman and Friedman were completed the "transcripts will likewise be forwarded to these two experts for their review." Defendants Scialabba and Friedman formally objected on January 26, 1976 to the addition of those experts.
The depositions of Drs. Wagman and Friedman were completed on January 29. On that date plaintiff's counsel advised their opponents that they had been endeavoring to complete the depositions of defendants for many months, and that the names of their experts and the "essence of their testimony had been given as soon as possible. Opposing counsel were "put * * * on notice" that "we intend to produce these two experts to testify at the time of trial." On February 3 Dr. Wagman furnished plaintiff a copy of a report by his proposed expert, a Dr. Kirschner, advising that "[i]n the event that you wish to depose Dr. Kirschner, please advise me in order that necessary arrangements can be made." Dr. Sussman's report was provided to defendants on February 25. On March 4 Dr. Wagman formally objected to plaintiff's late addition of experts. On March 10 Drs. Scialabba *145 and Friedman named Dr. Stuart Levin as an additional expert to be used in the event that Dr. Sussman was allowed to testify at the trial, and a copy of his report was furnished. A summary of "information received from Dr. Zimmerly" was mailed by plaintiff's counsel to defendants' counsel on March 15. The trial commenced on March 17.
R. 4:17-7 provides that where a party who has furnished answers to interrogatories thereafter obtains information rendering the answers incomplete or inaccurate, "amended answers shall be served not later than 20 days prior to the date first fixed for trial." Thereafter, amendments are to be allowed "only for extraordinary and compelling reasons and to prevent manifest injustice, and upon such terms as the court directs," and in no event where it appears that the evidence sought to be introduced was known to the party more than ten days prior to trial. Id.
There is no doubt whatever that all the parties, including plaintiff, sought through timely interrogatories the disclosure "of facts known and opinions held by experts," as well as their names and addresses and copies of their reports, as permitted by R. 4:10-2(d). It is clear that plaintiff did not comply therewith in the manner or within the time prescribed by the applicable rules, and that defendants objected to the late information. See Gittleman v. Central Jersey Bank and Trust Co., 103 N.J. Super. 175, 179 (App. Div. 1968), rev'd on dissenting opinion 52 N.J. 503 (1968). But it also appears that defendants, or some of them, were likewise remiss, although plaintiff voiced no similar objection at any time.
It is well settled that failure to furnish names of witnesses to be used at trial may result in the sanction of excluding their testimony. Brown v. Mortimer, 100 N.J. Super. 395, 401 (App. Div. 1968). Furthermore, under R. 4:23-5(b), the judge at trial may exclude the testimony of any expert whose report is not furnished pursuant to R. 4:17-4(a) and R. 4:17-7. But the application of the sanction is consigned to the sound discretion of the judge, *146 subject only to the rule that the sanction visited upon the party must be just and reasonable. Brown v. Mortimer, supra at 401. The factors which would "strongly urge" the trial judge, in the exercise of his discretion, to suspend the imposition of sanctions, are (1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence. Id. at 401-402. See also Branch v. Emery Transportation Co., 53 N.J. Super. 367, 375-376 (App. Div. 1958); D'Agostino v. Schaffer, 45 N.J. Super. 395, 402 (App. Div. 1957). This accords with the overriding objective of giving the defaulting party his day in court, with due regard, however, to protecting the opposing party from the effects of surprise or other prejudicial factors. Reilly v. Spiegelhalter, 100 N.J. Super. 276, 284 (App. Div. 1968).
In his discussion of the issue on plaintiff's motion for a new trial, the trial judge observed that he had "complied with the Gittleman Rule" in holding that "once the defendant, in advance of trial, makes it known that there is an objection to the late witnesses in this case or in that case, any case for that matter, then the procedural burden of going forward with a motion to relax the Rule then shifts to the plaintiff and the burden in this case shifts to the plaintiff." The advertence was to Gittleman v. Central Jersey Bank and Trust Co., supra, in which the dissenting judge, on whose opinion the Supreme Court reversed a determination that an expert witness had been properly barred from testifying, observed that while the "eleventh hour letter amendment" adding the name of an expert medical witness was contrary to the rule, defense counsel gave no indication of any objection to the amendment and plaintiff's attorney ascertained for the first time at trial that his right to call the witness was being challenged by defendant; consequently, "justice would better have been served by either granting plaintiff's motion for a mistrial, or granting plaintiff's subsequent motion for a new trial." 103 N.J. Super. at 179.
*147 We do not understand Gittleman to impose upon a defaulting party "the procedural burden of going forward with a motion to relax the rule," although we do not doubt that if such party risks going to trial over the previously announced objection to the production of a witness, expert or not, he cannot then seek refuge in a plea of having been lulled into a sense of false security by any inaction on the part of his opponent. He must still demonstrate "extraordinary or compelling reasons" for the relief sought and convince the trial judge that a denial would produce "manifest injustice." But where the aforementioned factors are present, the trial judge is not relieved of its responsibility to determine whether the imposition of the sanction should be suspended.
The trial judge here did not address himself at all to those factors. Although defendants draw from the lateness of the information regarding the experts and their reports a deliberate intention on the part of plaintiff to mislead, the record does not support that conclusion. The fact is that the discovery process continued long after the passing of the first trial date. The taking of depositions was not concluded until January 29, 1976. While the failure of plaintiff to move more promptly so as to avoid the threatened sanction is not to be condoned, it is to be noted that the letter of January 22, 1976, which informed defendants of the two experts, also made them aware of a probable delay in the receiving of their reports because of plaintiff's intent to submit to the experts the transcripts of the depositions when completed.
It is also evident that defendants were not surprised at trial by the offer of the two witnesses. Their anticipation of the production of the witnesses obviously produced their motion at the commencement of the trial to bar their testimony.
Nor does the record establish that defendants would have been prejudiced by the testimony of the two experts. Regardless of the lateness of the information, defendants knew, at least generally, the opinions the witnesses were prepared to express on the issue of medical malpractice. Moreover, at *148 least as to Dr. Sussman, if he were permitted to testify, counsel for Drs. Scialabba and Friedman were prepared to counter that testimony with their own medical expert. It is to be noted, additionally, that counsel for Dr. Wagman did not submit a copy of his independent expert's report to plaintiff until February 1976, and offered to make him available for a deposition, just as plaintiff had offered to do with their experts two weeks earlier.
We are satisfied from our careful review of the record that there was no design to mislead on the part of the plaintiff, and that defendants would have been neither surprised nor prejudiced by the evidence. Plaintiff, however, was placed in a position of having to rely solely on the testimony of Dr. Joselson, who, as the treating physician, was vulnerable to attack for his own diagnosis and treatment and who, in addition, had referred the patient to Dr. Medinets, now a witness in the opposing camp. She was deprived of the benefit of independent expert medical testimony. We think that, in the circumstances here present, the trial judge abused his discretion in disallowing the testimony of the witnesses without taking into account the aforementioned factors which, if considered, might have led him to suspend the imposition of that sanction. This error, we are convinced, was of such nature as to have been clearly capable of producing an unjust result. R. 2:10-2.
Accordingly, the judgment is reversed and the matter remanded for a new trial.