241 N.J. Super. 197 (1990)
574 A.2d 541
SHIRLEY W. RATNER AND LESTER A. RATNER, HER HUSBAND, PLAINTIFFS-APPELLANTS,
v.
GENERAL MOTORS CORPORATION, RUSSELL BUICK, JOHN DOES AND XYZ CORPORATIONS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 10, 1990.
Decided May 16, 1990.
*199 Before Judges PRESSLER, LONG and LANDAU.
Charles F. Sheeler argued the cause for appellants (Hogger and Sheeler, attorneys; Joseph Coult, of counsel; Charles F. Sheeler on the brief).
Rudy B. Coleman argued the cause for respondent (Carpenter, Bennett & Morrissey, attorneys; Rudy B. Coleman, of counsel; Thomas M. Moore, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
*200 Plaintiff Shirley Ratner was seriously injured in a one car accident in 1983. In 1985 she filed a complaint against General Motors Corporation and Russell Buick alleging that her injuries resulted from the defendant's manufacture and sale of a defective vehicle.[1] The case went to trial and the jury returned a verdict in favor of defendants. After denial of her motion for a new trial, plaintiff filed this appeal. Because we have concluded that trial errors, individually and in combination, denied plaintiff a full and fair adjudication of the merits of her case, we reverse.
On July 21, 1983, the 56-year-old plaintiff owned a 1980 Buick Regal which had travelled approximately 25,000 miles. The vehicle was manufactured by defendant General Motors Corporation and purchased from and serviced by defendant Russell Buick, Inc. Around noon on that date, plaintiff arranged for her parking garage to deliver the vehicle to the front of the garage, which was next to her Fort Lee apartment building. She left a package in the lobby and walked over to the front of the garage where her car was idling. Plaintiff entered the vehicle and locked the door, but did not put on her seat belt because she intended to get right out to pick up the package in the lobby. Plaintiff testified that she put her right foot on the brake and shifted the car into drive. She took her foot off the brake, intending to "creep out." According to plaintiff, although she never touched the accelerator, the vehicle began accelerating on its own and continued accelerating despite her frantic efforts to apply the brakes. The steering wheel became difficult to turn, and the car travelled 380 feet up an exit ramp and crashed into a concrete pillar.
Officer Paul Ottavio from the Fort Lee Police Department arrived on the scene within minutes. He found plaintiff unconscious on the front seat of her car and called for an ambulance. He testified that a brake test was performed as part of the subsequent investigation, and "the brakes functioned perfectly."
*201 Experts testified for both sides on the issue of the self-acceleration of the vehicle. Bruce Enz, an accident reconstruction expert called by plaintiff, offered his opinion "that there was a defective condition within the vehicle which caused an unintended acceleration, full acceleration of this vehicle, which was not due to driver input." Enz testified that the normal cause of such acceleration was a malfunctioning throttle control linkage but that his examination of the vehicle revealed it not to be the cause in this instance. Donald Waldecker, who testified for plaintiffs as an expert mechanic, found that the throttle was open at the time of the impact but could find no mechanical condition which would cause self-acceleration. Dr. Richard A. Schmidt testified for defendants as an expert in kinesiology and psychology and opined that due to a low-level error in movement, plaintiff's foot pressed the accelerator pedal when she meant to press the brake. William Christiansen, a General Motors automotive engineer, who testified for defendants as an accident reconstruction expert, offered his opinion that the rapid vehicle acceleration was caused by plaintiff's depression of the accelerator pedal and that if the brake had been applied as she described, the vehicle would have stopped. After deliberating, the jury answered in the negative the question of whether the car was defective.
During the course of the trial, plaintiff's reconstruction expert, Enz, testified that in the preparation of his report he examined plaintiff's shoes, which were found in the car, and the brake pedal. On the basis of his examination, he concluded that there was "a clear pedal imprint on the bottom of her right shoe that, in my opinion, was caused by the brake pedal." Defendants immediately objected that this testimony was not within the scope of the expert's report and should be stricken.[2] The trial judge agreed. The jury was then instructed to disregard Enz' testimony as to the imprint on the shoe. The *202 shoes, which had previously been admitted into evidence, were ordered withdrawn by the judge sua sponte.
It is well settled that a trial judge has the discretion to preclude expert testimony on a subject not covered in the written reports furnished in discovery. Nicholl v. Reagan, 208 N.J. Super. 644, 651, 506 A.2d 805 (App.Div. 1986) (citing R. 4:17-4(e); R. 4:23-5(b); Maurio v. Mereck Construction Co., Inc., 162 N.J. Super. 566, 569, 394 A.2d 110 (App.Div. 1978)). But see Amaru v. Stratton, 209 N.J. Super. 1, 14, 506 A.2d 1225 (App.Div. 1985) (affirming trial court decision not to exercise this discretion because the contested testimony "posed no danger of surprise or other prejudice and was based on material obtained ... during pretrial discovery.") The application of the sanction of exclusion
is consigned to the sound discretion of the judge, subject only to the rule that the sanction visited upon the party must be just and reasonable. [citation omitted]. The factors which would "strongly urge" the trial judge, in the exercise of his discretion, to suspend the imposition of sanctions, are (1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence. [Westphal v. Guarino, 163 N.J. Super. 139, 145-146, 394 A.2d 377 (App.Div. 1978), aff'd o.b. 78 N.J. 308, 394 A.2d 354 (1978).]
See also Pressler, Current N.J. Court Rules, Comment R. 4:17-7. The trial judge's discretion in excluding evidence is broad. State v. Sands, 76 N.J. 127, 386 A.2d 378 (1978). The decision as to exclusion must stand unless so wide of the mark that a manifest denial of justice resulted. State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982). See also State v. Boratto, 80 N.J. 506, 404 A.2d 604 (1979); State v. Rogers, 19 N.J. 218, 116 A.2d 37 (1955); Hill v. Newman, 126 N.J. Super. 557, 316 A.2d 8 (App.Div. 1973), certif. den. 64 N.J. 508, 317 A.2d 720 (1974).
Here, the judge found that while there was an absence of a design to mislead, defendants were clearly surprised by Enz' testimony and would be prejudiced by an unrefuted expert's opinion which corroborated plaintiff's version of the events. There are several problems with this ruling, the most *203 significant of which arises out of the nature of the evidence proffered. Plaintiff had a heavy burden in this case in which she alleged self-acceleration by the vehicle. Indeed, no expert was able to point to a specific defect in the automobile which caused the sudden acceleration. On this backdrop, Enz' testimony as to the brake's imprint on plaintiff's shoe was the proverbial smoking gun. It was the only objective evidence to support plaintiff's version of the events and, if accepted by the jury, would have been a heavy weight in the evidential balance. Indeed, this evidence might well have changed the outcome of the case. Under these circumstances, it was important for the judge to attempt to formulate a procedure short of outright exclusion, if one was possible, consonant with defendants' rights. Obviously, defendants should not have been forced to defend against Enz' pivotal testimony without preparation. Thus, the judge should have explored with defendants the possibility of an adjournment of the trial for the purpose of obtaining a deposition of Enz on the new evidence and, if warranted, their own expert evaluation of the shoes. If such an adjournment was unrealistic, a mistrial should have been granted. Indeed, at oral argument, defendants conceded that no prejudice would have resulted from the grant of a mistrial.
Where as here, the critical surprise evidence resulted through no fault of either plaintiff or her attorney, neither of whom had an inkling about the shoe imprint until trial, and defendant would suffer no prejudice from an adjournment or mistrial, the remedy of exclusion of this vital evidence cannot be said to have been just or reasonable. This decision, in context, was so wide of the mark that a denial of justice resulted.
We turn now to the second trial error which we think warrants reversal  defendants' use of the Physicians' Desk Reference (PDR). It was not disputed at trial that plaintiff's physician prescribed Inderal and Tofranil for her hypertension and that she had taken Tofranil the night before and Inderal on the morning of the accident. She testified that although she *204 was aware of several side effects of those drugs, they were not a problem for her. Defendants sought to have Dr. Chirls, their medical expert, testify that the PDR is an authoritative compilation of drugs relied upon in the practice of medicine. By this proffer, defendants were attempting to establish a foundation for the reading of the adverse side effects of Inderal and Tofranil from the PDR, in accordance with an Evid.R. 63(30) which states that:
Evidence of a statement of matters of interest to persons engaged in an occupation contained in a list, register, periodical, or other published compilation is admissible to prove the truth of any relevant matter so stated if the compilation is published for use by persons engaged in that occupation and is generally used and relied upon.
Plaintiff objected, contending that this testimony by Dr. Chirls was an unfair surprise. The trial judge then took judicial notice of the PDR under Evid.R. 9, eliminating the need for Dr. Chirls' testimony. Plaintiff stipulated that the PDR information was admissible under Evid.R. 63(30), but would not concede that it was admissible in this instance.
Plaintiff's objection was renewed when defendants sought to read the possible side effects of Inderal and Tofranil from the PDR to the jury. Plaintiff argued that this evidence had no connection to the case. However, the trial judge ruled that defendants had the right "to produce evidence of possibilities of the cause" of the accident, as in the medical malpractice cases of Paxton v. Misiuk, 34 N.J. 453, 170 A.2d 16 (1961), and Dalton v. Gesser, 72 N.J. Super. 100, 178 A.2d 64 (App.Div. 1962).
Defense counsel then read the pertinent sections of the PDR to the jury:
DEFENSE COUNSEL: Under the section headed, "Adverse Reactions Related to the Medication, Inderal:
"Most adverse effects have been mild and transient and have rarely required the withdrawal of therapy. Cardiovascular, congestive heart failure, anticipation of AV block, hypotension, paresthesia of hands, thrombocytopenic purpura," 
THE COURT: You started this. Go ahead.
DEFENSE COUNSEL: It will get better when I get to another section.

*205 "Arterial insufficiency usually of the Raynaud type, central nervous system, lightheadness, mental depression manifested by insomnia, lassitude, weakness, fatigue, reversible mental depression, progression to catatonia, visual distrubances, hallucinations, vivid dreams, an accute reversible syndrome characterized by disorientation for time and place, short term memory loss, emotional liability, slightly cloudy sensorium, and decreased performance of neuropsychometrics." As to the medication, Tofranil: "Note. Although the listing which follows includes a few adverse reactions which have not been reported with this specific drug, the pharamcological similarities among the tricyclic drugs, the pharmaceutist's advice, the tricyclic antidepressant drugs require that each of the reactions be considered when imipramine is administered." Under the subheading, "Psychiatrics. Confusional states, especially in the elderly, with hallucinations, disorientation, delusions, anxiety, restlessness, agitation, insomia and nightmares, hypomania, exacerbation of psychosis. Neurological. Numbness, tingling, paresthesia of the extremities, incoordination, ataxia, tremors, peripheral neuopathy," and others, I don't choose to read, your Honor, because I can't read them.
The trial judge then instructed the jury as follows:
THE COURT: Ladies and gentlemen, let me tell you how this comes about, what this evidence is in for, and what you can use it for.... A defense has the right to introduce evidence of possible other reasons why something happens in which the attempt is to hold them responsible. This is not evidence, in any way, to suggest that Mrs. Ratner suffered all of these side effects. These are all the potential side effects that you can get from these kind of drugs, so it is not evidence that she did suffer them. It's merely for the purpose of showing a possibility, which is going to be your function to make the determination, not any books or anything. Okay?
This was improper. In arriving at our conclusion, we do not address the troublesome issues of whether PDR evidence is the kind of "list register, periodical or ... compilation" described in Evid.R. 63(30) or whether it is a proper subject for judicial notice under Evid.R. 9. Even assuming that there is no hearsay bar against the use of such evidence and that it can be admitted through an abbreviated judicial notice procedure, without an expert opinion, it should not have been admitted here. The existence of the cornucopia of possible side effects listed in the PDR did not have a tendency to prove any material fact in this case. There was no suggestion in this record that plaintiff suffered any of the side effects listed in the PDR or that the accident was in any way attributable to such side effects. Indeed, if the jury had returned a verdict which, in some way, reflected its belief that plaintiff's side effects caused this accident, *206 we would be compelled to set the verdict aside as sheer speculation. Moreover, the trial judge's so-called "limiting instruction" served no purpose. If, as he said, the reading from the PDR was not to suggest that plaintiff suffered from side effects which may have caused the accident, it had no meaning at all and should have been excluded.
Here, we cannot say that plaintiff was not prejudiced by the laundry list of possible side effects defendants' counsel read to the jury, not a single one of which was related even obliquely to her own physical reaction. The statistical occurrence of a side effect is simply not probative of how a medication actually affects a particular patient. As such, the reading from the PDR was harmful error requiring reversal. This is not to suggest that a PDR entry would never be admissible. The question of its admissibility in a particular case is fact sensitive. Thus, for example, in a duty to warn case, where the fact in issue is whether a particular side effect is commonly known to attend the administration of a particular drug, a PDR entry might well be relevant and admissible. Feldman v. Lederle Laboratories, 97 N.J. 429, 436, 479 A.2d 374 (1984). We hold only that here it should have been excluded.
On a separate note, prior to trial the trial judge ruled on an in limine motion filed by defendants with respect to a report of the National Highway Transportation Safety Administration of consumer complaints regarding sudden self-acceleration by vehicles like plaintiff's 1980 Buick Regal. That ruling was premature. It should not have been made in the abstract but only in the context of the facts elicited at trial. Bellardini v. Krikorian, 222 N.J. Super. 457, 537 A.2d 700 (App.Div. 1988). If, as the case unfolded, notice became an issue, for example, the trial judge would be faced with entirely different considerations than if the complaints were offered to show a defect per se. Thus, on the retrial, the question of the admissibility of the *207 report should be decided at the point at which the evidence is offered, after an Evid.R. 8 hearing out of the jury's presence.
Reversed and remanded.
NOTES
[1] Plaintiff's husband, Lester A. Ratner, sued per quod.
[2] Plaintiff provided Enz' expert report to defendants in answer to interrogatories propounded in conformity with R. 4:10-2(d)(1), thus rendering the report a "binding discovery admission" within the meaning of Skibinski v. Smith, 206 N.J. Super. 349, 354, 502 A.2d 1154 (App.Div. 1985).