**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3557-17T3

VICTOR C. OTTILIO,

    Plaintiff-Appellant,

v.

STEPHEN T. DEEHAN, D.M.D.,
and STEPHEN T. DEEHAN,
D.M.D., P.A.,

    Defendants-Respondents.

_____

Argued September 11, 2019 – Decided October 16, 2019

Before Judges Whipple, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0252-15.

Gary M. Meyers argued the cause for appellant (G. Martin Meyers, PC, attorneys; Gary M. Meyers, on the briefs).

David Lustbader argued the cause for respondents (Philip M. Lustbader & David Lustbader, attorneys; David Lustbader, on the brief).

PER CURIAM

Plaintiff Victor Ottilio appeals from a no cause jury verdict in favor of Stephen Deehan, D.M.D., and his practice, Stephen Deehan, D.M.D., P.A. (collectively, defendants). As a result of the verdict, on March 5, 2018, the trial court entered a judgment dismissing plaintiff's dental malpractice complaint with prejudice. According to the complaint, while plaintiff, then sixty-five-years-old, was treated by Dr. Deehan through "periodic adjustment[s], cleaning and recementing of an upper bridge held in place by [p]laintiff's upper front teeth[,]" during a September 2013 visit, "without [p]laintiff's knowledge or consent," Dr. Deehan "glued [p]laintiff's bridge to his teeth with a [permanent] cement." Thereafter, in order to loosen the bridge and gain "access to [p]laintiff's teeth" underneath, "[d]efendant repeatedly . . . 'knock[ed]' it[.]" As a result, "every one of [p]laintiff's . . . top front teeth which had been holding the bridge in place" broke off, causing plaintiff "pain" and "suffering," and requiring surgical intervention.

On appeal, plaintiff challenges three of the court's evidentiary rulings, raising the following points for our consideration:

> I. THE TRIAL COURT ABUSED ITS DISCRETION BY BARRING PLAINTIFF'S LIABILITY EXPERT FROM PROVIDING ANY TESTIMONY REGARDING A KEY SET OF DENTAL X-RAYS [WITHOUT] CONDUCTING A RULE 104 HEARING TO SUBSTANTIATE

DEFENDANT[S'] CLAIM OF "SURPRISE" OR "PREJUDICE," AND [WITHOUT] EXPLORING AN ALTERNATIVE MEANS OF RESOLVING ANY "SURPRISE" OR "PREJUDICE" ACTUALLY PRESENTED[.]

II. PERMITTING DEFENDANT[S] TO INTRODUCE REPORTS AND OPINIONS OF NON-TESTIFYING EXPERTS, IN VIOLATION OF THE TRIAL COURT'S OWN [IN LIMINE] RULING AND OVER PLAINTIFF'S OBJECTION, WAS A GRAVE MISCARRIAGE OF JUSTICE REQUIRING REVERSAL [OF] THE RESULTING VERDICT AND REMAND FOR A NEW TRIAL[.]

III. THE TRIAL COURT ALSO ABUSED ITS DISCRETION BY PRECLUDING PLAINTIFF FROM MAKING ANY REFERENCE TO DEFENDANT'S DISCIPLINARY PROCEEDINGS AND CONSENT DECREE WITH THE NEW JERSEY STATE BOARD OF DENTISTRY[.][1]

Based on our review of the record and the applicable legal principles, we affirm.

---

[1] In his reply brief, plaintiff argues for the first time that "the cumulative impact of all three of the trial court's errors" warrant a reversal of the jury's verdict. However, a party may not advance a new argument in a reply brief. See Borough of Berlin v. Remington Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001) ("Raising an issue for the first time in a reply brief is improper") (citing State v. Smith, 55 N.J. 476, 488 (1970)).

I.

The proofs adduced at the trial revealed that over the course of ten years, plaintiff visited several dentists,[2] most of whom recommended the extraction of some or all of plaintiff's teeth due to loosening of the teeth caused by bone loss resulting from periodontal disease.[3] Notably, plaintiff acknowledged consulting Dr. Mark Terry, a periodontist, in 2000, who diagnosed plaintiff with advanced periodontitis and advised him to extract "all [his] teeth[.]" More recently, in January 2010, plaintiff consulted with Dr. Thomas Bissell, another periodontist, who recommended extracting plaintiff's remaining six upper front teeth[4] and replacing them with implants in order to avoid future problems. However, plaintiff rejected Dr. Bissell's recommendation because he wanted to keep his teeth for as long as possible. As a result, plaintiff saw Dr. Deehan in March

---

[2] Plaintiff estimated that he saw approximately ten dentists over the years.

[3] Periodontal disease was described by defendants' expert as "losing the bone . . . holding the teeth in place" from "bacteria underneath the gum," resulting in the loosening and ultimate loss of the teeth if untreated. The condition is "accelerated by the occlusal forces on the teeth."

[4] Plaintiff had already lost eight of his upper back teeth.

A-3557-17T3

2010, for a second opinion. Based on Dr. Deehan's alternate recommendation, plaintiff began treating with him thereafter.

Over the next three years, Dr. Deehan administered a course of treatment that allowed plaintiff to keep his teeth by continuing to use a "cantilevered" bridge[5] held in place by plaintiff's six upper front teeth. During the treatment, every three months, after plaintiff removed the bridge, Dr. Deehan would conduct deep cleanings and then affix the bridge back to the teeth with temporary cement. However, in September 2013, unbeknownst to plaintiff, Dr. Deehan used permanent cement to affix the bridge, instead of the temporary cement he used in the past. Over the next six months, despite using various dental implements, including a hammer-like instrument, Dr. Deehan had difficulty removing the bridge, which loosened when one of plaintiff's six front teeth broke off at or near the gum line. In December 2013, Dr. Deehan

_____

[5] Traditional bridges "involve creating a crown for the tooth or implant on either side of the missing tooth, with a pontic [(fake teeth)] in between." Cantilever bridges "are used when there are adjacent teeth on only one side of the missing tooth or teeth." Dental Health and Bridges, WebMD.com, https://www.webmd.com/oral-health/guide/dental-health-bridges#1 (last visited July 8, 2019). Plaintiff had a double cantilevered upper bridge, and a "[p]ermanently cemented . . . lower bridge[.]" In plaintiff's case, because "the teeth that were missing were the back teeth[,]" plaintiff's upper bridge was "fabricated . . . using his six front teeth, but adding two teeth on either side of the bridge." Plaintiff had been advised by prior dentists that the bridge would not last and could cause early tooth loss.

A-3557-17T3

recommended three alternative treatment plans, involving extracting the teeth and using implants or dentures, ranging in cost from $1,200 to $22,500. However, because plaintiff wanted to save his teeth, he rejected Dr. Deehan's recommendations. As a result, according to plaintiff, he suffered extreme pain and discomfort for sixteen months, while the loose bridge was cutting into his gums. When the bridge eventually came out in March 2015, all of plaintiff's upper front teeth broke, ultimately requiring surgical intervention to remove the roots.

During his deposition and trial testimony, Dr. Deehan agreed with Dr. Bissell's diagnosis that plaintiff had "advanced periodontal disease."[6] The defense played the deposition testimony of Dr. Bissell at trial, during which Dr. Bissell testified that based on his examination of plaintiff on January 5, 2010, he determined that "all of [his] upper teeth were mobile" or "loose." Dr. Bissell's "long-term" "prognosis" was that plaintiff's "upper teeth would not last[,]" and "[n]othing could be done to improve the situation," or "make the [upper] teeth any stronger," and "any type of prosthesis . . . was doomed to fail." Dr. Bissell's

---

[6] Dr. Deehan testified that after plaintiff's first visit, he obtained plaintiff's records, including his x-rays, from Dr. Bissell.

recommended treatment plan, which plaintiff rejected, was extraction and replacing the teeth with dentures or dental implants.

In an effort to avoid extraction as long as possible, Dr. Deehan agreed to treat plaintiff with "periodontal therapy," consisting of cleanings, "[d]eep scaling[,]" "root planing under local anesthetic," and "irrigation" with medication. Dr. Deehan acknowledged that on September 3, 2013, he used a permanent cement when he re-cemented plaintiff's bridge, instead of the temporary cement used in the past. He explained that "the teeth were . . . starting to truly fail[,]" and he "had no other option . . . to try to keep [the] bridge in [place]." According to Dr. Deehan, on that date, he observed that "one tooth was periodontally mobile,"[7] and another tooth was "fractured to the gum line." Dr. Deehan admitted that he did not discuss the change in cement with plaintiff but explained that "[i]t was a clinical judgment."

Dr. Deehan also acknowledged that he unsuccessfully "tapped" on the bridge with "a crown tapper," which he described as a hammer like device, "to

---

[7] Tooth mobility was defined as "movement of the teeth in the jawbone." However, according to plaintiff's expert, normal, healthy teeth are supposed to move to "a very minor" degree.

7

try to get the bridge off" as plaintiff requested.[8]  Despite being unable to remove the bridge during six different office visits from December 2013 to February 2014, Dr. Deehan testified that "[he] was still able to clean [plaintiff's] teeth with the bridge in place" by using "[p]iezoelectric scalers and irrigation."[9]  Dr. Deehan acknowledged that on December 30, 2013, he presented plaintiff with three alternative treatment plans.  He also later prescribed painkillers to treat plaintiff's complaints of pain and discomfort.  Ultimately, on April 22, 2014, after plaintiff rejected all three of Dr. Deehan's treatment plans, Dr. Deehan notified plaintiff in writing that he was terminating him as a patient due to his non-compliance with the treatment plan recommendations and a physical confrontation during his last visit.

Plaintiff's expert, Dr. Jay Marks, "a general dentist[,]" opined that while treating plaintiff, Dr. Deehan deviated from the applicable standard of care for the practice of dentistry in a variety of ways.  As to the diagnosis and treatment protocol, Dr. Marks disagreed that plaintiff suffered from periodontal disease so

---

[8]  During the trial, an audio recording of a visit when Dr. Deehan used the crown tapper on plaintiff's bridge indicated approximately fifty or sixty taps.  The visit was recorded by plaintiff without Dr. Deehan's knowledge.

[9]  Dr. Deehan testified that while treating plaintiff, he had also been cleaning and scaling the lower teeth without removing the bridge.

severe that it warranted extracting all of his teeth. Dr. Marks also opined that a tooth "broken at the gum line" could be restored through a "[p]ost-and-core procedure[,]" without the need for extraction. As to specific deviations, Dr. Marks testified Dr. Deehan should have informed plaintiff that "the cement was changed from temporary cement to permanent cement." Dr. Marks also opined that Dr. Deehan should not have used "a crown tapper" to remove the bridge without informing plaintiff of the risk that "the tooth could break," and should have offered a less traumatic alternative "technique" when the crown tapper proved unsuccessful.

Further, according to Dr. Marks, Dr. Deehan should have "verbally" explained to plaintiff and documented the risks and benefits of the alternative treatment plans. Additionally, Dr. Marks testified that Dr. Deehan should have taken "baseline x-rays" when plaintiff first visited him, rather than "four years after" plaintiff's first visit. Dr. Marks also opined that during the four years of treatment, Dr. Deehan failed to treat plaintiff for teeth decay. Dr. Marks concluded that given the slight nature of periodontal disease, had plaintiff's teeth been treated for decay and had the crown tapper not been used as excessively, plaintiff's teeth could have been saved.

A-3557-17T3

In formulating his opinion, unlike Dr. Marks, the defense expert, Dr. Steven Scrivo, a periodontist, examined plaintiff and reviewed his complete dental history, both before he treated with Dr. Deehan and after. Based on his review of plaintiff's dental history, he diagnosed plaintiff with chronic periodontal disease dating back to 2000. According to Dr. Scrivo, plaintiff's dental prognosis at that time was aggravated because "he was a smoker[,]" had poor dental hygiene, and "was a diabetic." Dr. Scrivo also opined that based on the design of plaintiff's cantilever bridge, which was completed in 2009 and two of his prior dentists recommended against, plaintiff "was weakening already we[a]k teeth" whenever "he chewed anything hard[.]"

Dr. Scrivo opined that Dr. Deehan did not deviate from the applicable standard of care in treating plaintiff because it was "well documented" that plaintiff "came to him with a hopeless bridge," "after multiple dentists, over [twenty] years, told him to do things" that "he refused to do."[10] According to Dr. Scrivo, plaintiff "came to [Dr. Deehan] knowing[] that the teeth were loose," and that "the bridge wa[s not] going to last." Moreover, Dr. Scrivo testified that plaintiff's cantilever bridge was designed as a "[p]ermanent bridge[]" that should

_____

[10] Dr. Scrivo specifically referred to plaintiff's treatment by prior dentists who did not testify at trial, including Drs. Terry, VanVliet, and Zuckerman.

have been "permanently cemented on," and remained in place "permanently, all the time[,]" rather than "com[ing] on and off." Nonetheless, according to Dr. Scrivo, because the teeth were loose, "[t]he bridge could[ not] have been held in [place] with any cement," so the type of cement Dr. Deehan used was "irrelevant."

Following the jury verdict, the judge entered a conforming order and this appeal followed.

II.

First, plaintiff argues the judge erred in precluding Dr. Marks from making any reference during his testimony to Dr. Bissell's 2010 x-rays on the ground that Dr. Marks made no reference to the x-rays in his original report or his deposition testimony. According to plaintiff, given "the absence of a design to mislead," the "absence of the element of surprise," and the "absence of prejudice" to defendants, the judge "should have, at the very least, conducted a Rule 104 hearing . . . [before] imposing the draconian sanction of exclu[sion]." We disagree.

"It is well settled that a trial judge has the discretion to preclude expert testimony on a subject not covered in the written reports furnished in discovery." Ratner v. Gen. Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990)

11

(citations omitted). See R. 4:23-5(b) (permitting the trial court to exclude the testimony of an expert whose report is not furnished prior to trial); R. 4:17-4(e) (barring an expert from testifying at trial if the expert's report containing, among other things, the expert's opinions and the facts and data considered in forming the opinions, is not furnished in discovery). The sanction of exclusion

> is consigned to the sound discretion of the judge, subject only to the rule that the sanction visited upon the party must be just and reasonable. The factors which would "strongly urge" the trial judge, in the exercise of his discretion, to suspend the imposition of sanctions, are (1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence.
>
> [Westphal v. Guarino, 163 N.J. Super. 139, 145-46 (App. Div. 1978) (citations omitted).]

"These concepts are somewhat elusive because they cannot always be objectively determined." Velazquez ex rel. Velazquez v. Portadin, 321 N.J. Super. 558, 576 (App. Div. 1999), rev'd on other grounds, 163 N.J. 677 (2002). See Mauro v. Owens-Corning Fiberglas Corp., 225 N.J. Super. 196, 206 (App. Div. 1988) (affirming the exclusion of expert testimony regarding statistics because such statistics "were not contained in [the expert]'s written report or any other discovery material"); McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 171 (App. Div. 1987) ("[w]hen an expert's report is furnished, 'the expert's

testimony at trial may be confined to the matters of opinion reflected in the report, . . . '[h]owever, the logical predicates for and conclusions from statements made in the report are not foreclosed") (quoting Maurio v. Mereck Constr. Co., Inc., 162 N.J. Super. 566, 569 (App. Div. 1978)). Cf. Congiusti v. Ingersoll-Rand Co., Inc., 306 N.J. Super. 126, 131 (App. Div.1997) (holding plaintiffs could not claim surprise because "[w]hile the experts had not fully disclosed their theories in their reports, had they been deposed by plaintiffs, their depositions might have fully revealed the bases for their eventual testimony"); Amaru v. Stratton, 209 N.J. Super. 1, 14 (App. Div. 1985) (affirming trial court decision permitting the contested testimony because it "posed no danger of surprise or other prejudice and was based on material obtained . . . during pre-trial discovery."). Nonetheless, "[t]he trial judge's discretion in excluding evidence is broad[,]" and "[t]he decision as to exclusion must stand unless so wide of the mark that a manifest denial of justice resulted." Ratner, 241 N.J. Super. at 202.

Here, prior to Dr. Marks' testimony, defendants moved to preclude Dr. Marks from testifying about the 2010 x-rays taken by Dr. Bissell during his consultation with plaintiff. Defense counsel stated he was "surprise[d]" to learn "for the first time" that Dr. Marks intended to "interpret[]" the x-rays,

presumably "to bolster his opinion," because Dr. Marks did not rely on the x-rays in his "detailed report" or during his "two-hour deposition" taken on October 16, 2017. According to defense counsel, instead, Dr. Marks had indicated he "coul[d not] read" the x-rays. Defense counsel explained if he had received "advance" notice, he "could have asked [his] expert for a supplemental report" and he "could have asked Dr. Bissell . . . [to] interpret[] his own x-rays" during his deposition, neither of which occurred. Additionally, he would have "prepared to question [Dr. Marks] differently."

In response, plaintiff's counsel strenuously objected, stating they had "been attempting to get readable copies of Dr. Bissell's x-rays from . . . defendant" for some time, but were consistently stonewalled. Plaintiff's counsel disputed that there was "surprise" or "prejudice" to the defense because it was defendants "who brought Dr. Bissell in[to] the case." He protested that it would be unfair to preclude Dr. Marks' testimony since the defense expert commented extensively on Dr. Bissell's x-rays in his report and deposition. Plaintiff's counsel requested "a Rule 104 [h]earing" on the issue.

Preliminarily, the judge noted that because plaintiff was Dr. Bissell's patient, he could have obtained a copy of the x-rays directly from Dr. Bissell. The judge then explained that the expert was required "to give the whys and the

wherefores for [the] opinion" and "outline" what was "reviewed and what [was] the basis" for the opinion "so the other side is prepared." The judge determined that because "[Dr.] Bissell's x-rays were not a basis [for] his opinion[,]" plaintiff "di[d not] follow the discovery rules" and, as a result, Dr. Marks would be "confined to his report[.]"

We are satisfied that there was no abuse of discretion. While there was no evidence of a design to mislead, defense counsel was clearly surprised and would have been prejudiced by Dr. Marks' newfound reliance on Dr. Bissell's x-rays in formulating his opinion. Furthermore, because the parties were given an adequate opportunity to be heard, and there was an adequate factual record upon which to adjudicate the issue, we discern no abuse of discretion in the judge's failure to conduct a Rule 104 hearing, a decision that is likewise "remitted to the trial court's discretion[.]" Kemp ex rel. Wright v. State, 174 N.J. 412, 432 (2002).

Next, plaintiff argues that despite the judge granting his in limine motion "to preclude reference to the opinions and reports" of plaintiff's non-testifying former dentists, Dr. Scrivo made numerous "misleading" references to those opinions and reports "to bolster his own opinions" during his testimony. Plaintiff asserts that by allowing the testimony to stand, the judge "unwittingly

15

fostered exactly what the Supreme Court was attempting to avoid in its ruling in

Hayes v. Delamotte, 231 N.J. 373 [(2018)]," the "cumulative impact" of which

"clearly constituted a severe miscarriage of justice[.]"  We disagree.

N.J.R.E. 703 provides:

> The facts or data in the particular case upon which an
> expert bases an opinion or inference may be those
> perceived by or made known to the expert at or before
> the hearing.  If of a type reasonably relied upon by
> experts in the particular field in forming opinions or
> inferences upon the subject, the facts or data need not
> be admissible in evidence.

"[N.J.R.E.] 703 was intended to allow more latitude in the admission of expert

opinion testimony." Agha v. Feiner, 198 N.J. 50, 62 (2009) (citation and internal

quotation marks omitted).  "Thus, the testifying expert is generally permitted to

detail for the trier of fact all of the materials, including . . . other experts' reports,

on which he relied in deriving his opinion, so long as they are of a type

reasonably relied upon by experts in his field." Ibid.  For that reason, "an expert

may testify as to the [opinion] of a non-testifying expert on which the testifying

expert relied in reaching his or her conclusion." Macaluso v. Pleskin, 329 N.J.

Super. 346, 355 (App. Div. 2000).

Equally pertinent to this issue, however, is N.J.R.E. 808, which limits the

presentation of hearsay expert opinions to a factfinder as follows:

Expert opinion which is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the trial judge finds that the circumstances involved in rendering the opinion, including the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness.

"The import of [N.J.R.E.] 808 . . . is that some expert opinions contained in business records or other sources are admissible, but others are not." James v. Ruiz, 440 N.J. Super. 45, 62 (App. Div. 2015). See N.J.R.E. 803(c)(6) (providing that even if the other elements of the business record exception to the hearsay rule are satisfied, expert opinions included within an otherwise admissible business record are also subject to N.J.R.E. 808). However, "[i]f the requirements of [N.J.R.E.] 808 are met, and a testifying expert has reasonably relied upon the non-testifying expert's opinions," as permitted under N.J.R.E. 703, "then the testifying expert may be permitted to refer to that absent expert's opinions in the course of explaining his or her own opinions in court." James, 440 N.J. Super. at 64.

Although N.J.R.E. 703 permits "a testifying expert" to refer to hearsay statements "by a non-testifying expert . . . for the purpose of apprising the jury of the basis for his opinion, it does not allow expert testimony to serve as 'a

vehicle for the wholesale [introduction] of otherwise inadmissible evidence.'" Agha, 198 N.J. at 63 (quoting State v. Vandeweaghe, 351 N.J. Super. 467, 480-81 (App. Div. 2002)) (alteration in original). Similarly, "[a]n expert witness should not be allowed to relate the opinions of a nontestifying expert merely because those opinions are congruent with the ones he has reached," Krohn v. N.J. Full Ins. Underwriters Ass'n, 316 N.J. Super. 477, 486 (App. Div. 1998), or use "this pathway . . . as a 'subterfuge to allow an expert to bolster the expert testimony by reference to other opinions of experts not testifying.'" James, 440 N.J. Super. at 64 (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 7 on N.J.R.E. 703 (2014)).

Thus,

> the combined impact of [N.J.R.E.] 703 and [N.J.R.E.] 808 is to limit the ability of a testifying expert to convey to a jury either (1) objective "facts or data" or (2) subjective "opinions" based upon such facts, which have been set forth in a hearsay report issued by a non-testifying expert. In either instance, the testifying expert may not serve as an improper conduit for substantive declarations (whether they be objective or subjective in nature) by a non-testifying expert source.
>
> [Id. at 66.]

"Said in a different way, the contents of a non-testifying expert's report may not be used as a 'tie breaker' between competing experts." Hayes, 231 N.J. at 392-93 (quoting James, 440 N.J. Super. at 72).

"In short, under [N.J.R.E.] 703, an expert may give the reasons for his opinion and the sources on which he relies, but that testimony does not establish the substance of the report of a non-testifying physician." Agha, 198 N.J. at 64 (citing Day v. Lorenc, 296 N.J. Super. 262, 267 (App. Div. 1996)). See also Vandeweaghe, 351 N.J. Super. at 480 (noting that hearsay statements upon which an expert relies are "not admissible substantively as establishing the truth of the statement") (citations omitted). "That is why our court rules provide that where an expert references the report of a non-testifying expert to explain the basis of his or her own opinion, it is incumbent upon the trial judge, upon request, to instruct the jury regarding its limited use." Agha, 198 N.J. at 63. "Even when admitted, therefore, hearsay statements relied upon by an expert may be used for the limited purpose of apprising the jury of the basis of the testifying expert's opinion, but not for the correctness of the non-testifying expert's conclusion[.]" Hayes, 231 N.J. at 392-93 (citing Agha, 198 N.J. at 63).

Here, prior to jury selection, asserting that Dr. Scrivo's opinion was "based largely, if not entirely, upon the opinions of previous dentists[] who treated

A-3557-17T3

[plaintiff,]" plaintiff's counsel moved in limine to preclude Dr. Scrivo from "rely[ing] upon their testimony or their opinions" if they did not testify. Defense counsel countered that while defendants intended to refer to the "records" and "clinical findings" of other treating dentists, particularly Dr. Bissell, "Dr. Scrivo came to his own conclusion based upon the facts in the case and the x-rays." Acknowledging the prohibition against "bootstrapping," see James, 440 N.J. Super. at 69 (disapproving "of improper 'bootstrapping' of a non-testifying expert's findings on complex and disputed matters"), the judge observed Dr. Scrivo was "entitled to rely on the record" from "prior treatment" but any "opinions" or "predictions" contained in those records may be objectionable, depending upon how the questions were posed to Dr. Scrivo. See Biunno, Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 104 ("As a general rule, a trial judge should not rule on the admissibility of particular evidence until it is actually offered at trial.").

In fact, during Dr. Scrivo's testimony, the judge sustained plaintiff's specific objection to Dr. Scrivo testifying about Dr. Terry's opinion, but permitted Dr. Scrivo to testify about Dr. Terry's records in formulating his (Dr. Scrivo's) own opinion. Similarly, the judge restricted Dr. Scrivo's testimony in relation to Dr. Zuckerman's treatment of plaintiff to Dr. Zuckerman's treatment

notes. On appeal, plaintiff asserts that although "neither Dr. Van Vliet, Dr. Zuckerman, nor Dr. Terry ever testified at . . . trial[,]" Dr. Scrivo's testimony "effectuat[ed] the wholesale introduction of the reports and opinions of [these] nontestifying experts." Further, plaintiff states Dr. Scrivo "misrepresented the opinions of Drs. Van Vliet and Zuckerman," to "'bolster' his own opinions, by showing that [their] opinions agreed with his own." We disagree with plaintiff's characterization of Dr. Scrivo's testimony. Despite referring to the treatment records and notes of Drs. Terry, Van Vliet, and Zuckerman, all of whom had previously treated plaintiff, Dr. Scrivo presented his own opinion based on his personal examination of plaintiff and his review of plaintiff's complete dental history, dating back to 2000.

The fact that plaintiff's prior dentists provided similar diagnoses was not offered as a means of vouching for or reinforcing Dr. Scrivo's opinion, but to detail the materials upon which he relied in formulating his own independent opinion, as permitted under N.J.R.E. 703 and 808. Moreover, on cross-examination, Dr. Scrivo testified that he disagreed with Dr. Terry's opinion regarding the suitability of plaintiff's cantilever bridge, demonstrating that the hearsay opinion was not used "substantively as a 'tie breaker,' providing the jury

21

with a third opinion on the hotly disputed subject." James, 440 N.J. Super. at 72.

The procedural wrinkle here is that plaintiff failed to request a limiting instruction, apprising the jury of "the limited purpose" for which the hearsay statements of the non-testifying doctors were admitted, as contemplated in Hayes, 231 N.J. at 392-93. See State v. Humanik, 199 N.J. Super. 283, 305 (App. Div. 1985) ("It has long been the law that hearsay statements upon which an expert relies are admissible, not for establishing the truth of their contents, but to apprise the jury of the basis of the opinion reached."). Because of plaintiff's omission, the plain error standard applies. See State v. Townsend, 186 N.J. 473, 498 (2006) (reviewing trial court's lack of limiting instruction on proper use of expert testimony under plain error because defendant failed to request one). Under that standard, in order to warrant reversal, the error must "have been clearly capable of producing an unjust result." R. 2:10-2. In the circumstances of this case, we are satisfied the omission does not meet the requisite standard. See State v. Macon, 57 N.J. 325, 336 (1971) (holding that not just any possibility of an unjust result is sufficient but rather the party must demonstrate the possibility of "whether the error led the jury to a result it otherwise might not have reached").

A-3557-17T3

Finally, plaintiff argues that the judge's "[i]n [l]imine ruling, absolutely barring [him] from making any reference to [a] Consent Order entered into by [Dr. Deehan] with the New Jersey State Board of Dentistry, and/or the disciplinary proceedings leading up to the entry of that Order, . . . constituted an abuse of discretion," warranting reversal. In a March 5, 2014 Consent Order, the Board sanctioned Dr. Deehan based on a review of his "dental practice . . . and in particular the records of ten . . . patients." Among other things, the Board found that Dr. Deehan "failed to identify and treat obvious signs of decay" and failed to "comply with Board regulations" related to "recordkeeping." Plaintiff posits the evidence was admissible as habit evidence under N.J.R.E. 406 because the Board's findings were based on a review of the records of ten patients. We disagree.

"While evidence of a character trait generally is inadmissible, evidence pertaining to a 'habit' is permitted [under N.J.R.E. 406]." Showalter v. Barilari, Inc., 312 N.J. Super. 494, 512 (App. Div. 1998). Under N.J.R.E. 406, "[e]vidence, whether corroborated or not, of habit or routine practice is admissible to prove that on a specific occasion a person . . . acted in conformity with the habit or routine practice." N.J.R.E. 406(a). "Evidence of specific instances of conduct is admissible to prove habit or routine practice if evidence

A-3557-17T3

of a sufficient number of such instances is offered to support a finding of such habit or routine practice." N.J.R.E. 406(b).

The purpose of habit evidence is to show "the person's regular practice of responding to a particular kind of situation with a specific type of conduct." State v. Kately, 270 N.J. Super. 356, 362 (App. Div. 1994) (citation omitted). Hence, "[b]efore a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." Sharpe v. Bestop, Inc., 158 N.J. 329, 331 (1999) (quoting Thompson v. Boggs, 33 F.3d 847, 854 (7th Cir. 1994)). To that end, "two factors are considered controlling as a rule: adequacy of sampling and uniformity of response." Id. at 332 (citation omitted). See Jones v. S. Pac. R.R., 962 F.2d 447, 449 (5th Cir. 1992) (holding that nine diverse safety violations do not show "habit" of negligence).

Here, at the pre-trial hearing on defendants' in limine motion, the judge sustained defendants' objection, ruling that the evidence was unduly prejudicial and therefore inadmissible. After confirming that plaintiff was not one of the ten patients identified in the order, the judge explained that if he admitted the evidence, he "would end up trying ten dental negligence cases." Our trial courts

are vested with broad discretion in determining whether proffered evidence is relevant, and if so, whether it should be excluded under N.J.R.E. 403 because its probative value is substantially outweighed by the risk of undue prejudice, confusion of issues, misleading the jury, or other considerations. Wymbs ex rel. Wymbs v. Twp. of Wayne, 163 N.J. 523, 537 (2000).

For that reason, we review such decisions for abuse of discretion, Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010), which a party may demonstrate by establishing the trial court's ruling resulted in "manifest error or injustice," Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (citation omitted), or by demonstrating "there has been a clear error of judgment." State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). Here, plaintiff has demonstrated neither manifest error, injustice, nor a clear error of judgment.

Moreover, although not specifically addressed by the judge, we are satisfied that given the small sampling of patients, the offered evidence was insufficient to establish habit, admissible under N.J.R.E. 406. The applicability of N.J.R.E. 406 is of no consequence, however, as the judge properly excluded the evidence under N.J.R.E. 403. See Griffin v. City of E. Orange, 225 N.J. 400, 420 (2016) (demonstrating that while certain evidence may "not [be] subject to

exclusion under" other evidentiary "rule[s], it nonetheless [can] be barred pursuant to N.J.R.E. 403").  Likewise, the proffered evidence was excludible under N.J.R.E. 404(b), barring introduction of "[e]vidence of other . . . wrongs, or acts . . . to prove the disposition of a person in order to show that such person acted in conformity therewith[,]" which, in this case, was plaintiff's stated purpose.  See Harris v. Peridot Chem. (N.J.), Inc., 313 N.J. Super. 257, 276-83 (App. Div. 1998) (acknowledging the application of N.J.R.E. 404(b)'s prohibition in civil cases).

To the extent we have not specifically addressed any of plaintiff's remaining arguments, we deem them without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3557-17T3