**TAX COURT OF NEW JERSEY**



JOSHUA D. NOVIN
Judge

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

March 4, 2022

Robert D. Blau, Esq.
Blau & Blau
223 Mountain Avenue
Springfield, New Jersey 07081

Bruce J. Stavitsky, Esq.
James T. Ryan, III, Esq.
Stavitsky & Associates, LLC
350 Passaic Avenue
Fairfield, New Jersey 07004

> Re:     West Orange Township
> v. Westrange LLC CVS and Westrange LLC c/o Ecova MS363[1]
> Docket Nos. 005443-2015, 005358-2016,
> 002018-2017, 004370-2018, and 000886-2019

Dear Mr. Blau, Mr. Stavitsky, and Mr. Ryan:

This letter constitutes the court's opinion following trial of the local property tax appeals

instituted by plaintiff, West Orange Township (hereinafter "West Orange"). West Orange charges

that the 2015, 2016, 2017, 2018, and 2019 local property tax assessments on the property at 265

Prospect Avenue, West Orange, Essex County, New Jersey (the "subject property"), are less than

the property's true or fair market value. Accordingly, West Orange seeks to raise the 2015, 2016,

2017, 2018, and 2019 local property tax assessments.

---

[1] West Orange Township's 2015 Complaint identifies the defendant as WestOrange LLC CVS. West Orange Township's 2016, 2017, 2018, and 2019 Complaints identify the defendant as WestOrange LLC c/o Ecova MS363. However, the court's review of the Deed dated March 19, 2014, discloses that the name of the property owner is Westrange, LLC. Accordingly, the court amends the pleadings to reflect the correct property owner name. See R. 4:9-2.






For the reasons stated more fully below, the court affirms the 2015, 2016, 2017, 2018, and 2019 local property tax assessments.

## I. Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact based on the evidence and testimony offered during trial.

As of each valuation date, New Jersey CVS Pharmacy, LLC ("CVS") was the ground lessee of the subject property.[2] The subject property is identified on West Orange's municipal tax map as block 153.16, lot 1.

The subject property is located along the southwest corner of Prospect Avenue and Eagle Rock Avenue, between Prospect Avenue and Woodhull Avenue. The site is rectangular-shaped and comprises 2.233 acres. The lot has vehicular ingress from and egress to Woodhull Avenue and the southbound traffic lanes along Prospect Avenue.[3] The lot contains approximately 372.45 feet of frontage along Prospect Avenue, 237.85 feet of frontage along Eagle Rock Avenue, and 350.00 feet of frontage along Woodhull Avenue.

The subject property is improved with a one-story masonry and steel freestanding CVS Pharmacy. The building comprises a gross area of 16,947 square feet divided as follows: (i) 9,416 square feet retail sales area; (ii) 1,080 square feet pharmacy area; (iii) 1,945 square feet common

---

[2] On or about March 13, 2012, the former property owner, Rockpro Capital Corp. ("Rockpro") and CVS executed a ground lease for the subject property for a twenty-five-year initial term (the "Ground Lease"). The Ground Lease required Rockpro to secure all necessary site permits and approvals to construct a CVS Pharmacy. CVS was responsible for demolishing the existing improvements, sitework, and construction of the CVS Pharmacy building. Under Section 6 of the Ground Lease, CVS is responsible for "all taxes, special and general assessments . . . which shall or may become due and payable. . . ." By Deed dated March 19, 2014, the subject property was conveyed, subject to the Ground Lease, from Rockpro to Westrange, LLC, for reported consideration of $7,620,000.

[3] No vehicular access to the subject property is afforded along Eagle Rock Avenue.






and support areas; (iv) 2,200 square feet receiving area; and (v) 2,306 square feet mezzanine storage area.[4] Construction of the CVS Pharmacy was completed in or about November 2014. As constructed, the building contains a single-lane drive-up pharmacy window and approximately seventy parking spaces.[5]

The subject property is in West Orange's B-2 General Business district with permitted uses, including retail stores; personal service stores or studios; offices or office buildings; businesses or vocational schools; restaurants; bars; and massage, bodywork, or somatic therapy establishments. Thus, operation of the subject property as a retail pharmacy is a legally conforming use.[6]

Public and municipal utilities service the site. The subject property is in Flood Hazard Zone X, denoting an area of "minimal flood hazard" and outside of the Special Flood Hazard Area.[7]

West Orange timely filed complaints challenging the subject property's 2015, 2016, 2017, 2018, and 2019 tax year assessments. The matters were tried to conclusion over several days.

During trial, West Orange offered testimony from a New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation ("West Orange's expert"). West Orange's expert prepared an appraisal report containing photographs, market data, and expressing opinions of the subject property's true or fair market value as of the October 1, 2014, October 1, 2015, October 1, 2016, October 1, 2017, and October

---

[4]  According to West Orange's expert, the 16,947 square foot building size was reflected on the "as-built" plans submitted by the developer to West Orange.

[5]  The estimated costs for the subject property's site improvements and building construction were approximately $3,931,988.

[6]  The subject property is also located in West Orange's Eagle Rock Commercial Area Redevelopment Plan. However, the subject property has not been identified as a property in need of redevelopment.

[7]  See https://www.fema.gov/glossary/flood-zones






1, 2018 valuation dates. During trial, CVS offered no evidence of the subject property's true value, electing to rest on the presumption of validity that attaches to the local property tax assessments.[8]

As of each valuation date, the subject property's tax assessment, implied equalized value, and West Orange's expert's value conclusions are set forth below:

| Valuation date | Tax assessment | Average ratio of assessed to true value | Implied equalized value | West Orange's expert value opinion |
|---|---|---|---|---|
| 10/1/2014 | $5,259,500 | 97.22% | $5,409,895 | $9,465,000 |
| 10/1/2015 | $5,259,500 | 93.90% | $5,601,171 | $9,520,000 |
| 10/1/2016 | $5,259,500 | 92.50% | $5,685,946 | $9,630,000 |
| 10/1/2017 | $5,259,500 | 89.81% | $5,856,252 | $9,645,000 |
| 10/1/2018 | $5,259,500 | 87.74% | $5,994,415 | $9,760,000 |

Accepting the opinions of West Orange's expert would lead to an increase in the subject property's local property tax assessments. Thus, one of the central issues for the court to consider is whether West Orange has proven, by a fair preponderance of the evidence, that the subject property's tax assessments are erroneous. See Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992) (concluding that once the presumption of validity attaching to the original tax assessment has been overcome, the court must turn to a consideration of the evidence "based on a fair preponderance of the evidence.")

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). Thus, the appealing party shoulders the burden of proving that the

---

[8] CVS identified a New Jersey certified general real estate appraiser as a proposed testifying expert witness. However, following West Orange's presentation of its proofs, CVS elected not to elicit any testimony or evidence from its proposed testifying expert witness or any other witness.





assessment is erroneous.  Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985).  The presumption of correctness remains in place "until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). The party challenging the local property tax assessment or county board of taxation judgment can only rebut the presumption by introducing "cogent evidence" of true value.  Pantasote Co., 100 N.J. at 413.  That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952).  Accordingly, at the close of the proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

The evidence presented "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)).  "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Here, at the close of West Orange's proofs, CVS moved to dismiss these matters under R. 4:37-2(b), arguing that West Orange failed to overcome the presumption of validity that attaches to the local property tax assessments.  Specifically, CVS argued that West Orange's expert's appraisal report contained fundamental flaws because his concluded highest and best use was subjective and not based on market data and research, thereby amounting to a net opinion. However, for the reasons set forth on the record and detailed herein, the court denied CVS' motion.






B.      Highest and Best Use

First, CVS argues that West Orange's expert rendered a "net opinion that the subject property's [as improved] highest and best use was narrowly defined as [a] 'drugstore.'"  CVS maintains that West Orange's expert's statement that, because "Walgreens currently has no presence within the community, it would represent the most logical and probable tenancy for the subject property in the event of vacancy" casts a too narrow net on all legally permissible, physically possible, financially feasible, and maximally productive uses of the subject property, as improved.

Next, CVS contends that West Orange's expert's focus on New Jersey pharmacy licensing requirements and statement that the property "was designed, built and configured for use as a retail pharmacy, it cannot be considered as general or generic retail space," results in West Orange's expert valuing the business and not the real estate.  CVS submits that the highest and best use "is not the value of the subject property to CVS (or Walgreens), but rather the price on the open market without undue stimulus."

An indispensable element not only to principles of property valuation, but to the determination of a property's true market value is discerning its highest and best use.  Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992).  See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005).  "For local property tax assessment purposes, property must be valued at its highest and best use."  Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000).  Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process."  Ford Motor Co., 10 N.J. Tax at 161.

In the quest to determine a property's highest and best use, an appraiser must sequentially






consider "the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

When engaging in a highest and best use analysis, the appraiser must interpret "the market forces that affect the subject property and identify[] the use or uses on which the final opinion of value is based." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013). An appraiser must closely examine the parcel being appraised "for all possible uses and that use which will yield the highest return should be selected." Inmar Associates, Inc. v. Edison Twp., 2 N.J. Tax 59, 64 (Tax 1980). In sum, the highest and best use analysis is truly a "function of the market." Entenmann's Inc., 18 N.J. Tax at 545.

CVS stipulated to West Orange's expert's qualifications as an expert in the field of real property valuation, and the court agreed. See N.J.R.E. 702 (stating that an individual possessing knowledge, skill, experience, training, or education may be qualified by the court as an expert and offer opinion testimony). Although an individual may be duly qualified as an expert and offer opinion testimony, the expert's opinion must nevertheless be rooted in "facts, or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence[,] but which is the type of data normally relied upon by experts.'" Polzo v. County of Essex, 196 N.J. 569, 583 (2008); N.J.R.E. 703. An expert's opinion that lacks a credible foundation and "consist[s] of bare conclusions unsupported by factual evidence is inadmissible." Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002). The expert must proffer "'the why and wherefore' of his or her opinion, rather than a mere conclusion." Ibid. (quoting Jimenez v. GNOC Corp., 286 N.J. Super. 533, 540






(App. Div. 1996)). Thus, the worth, significance, and "probative utility of an expert's opinion stands or falls on the facts and reasoning offered in its support." Bonsangue, 316 N.J. Super. at 284.

Here, West Orange's expert concluded that the highest and best use of the subject property, as vacant, was for retail use.[9] Specifically, during trial, he opined that the highest and best, as vacant, is as a retail pharmacy. In both his appraisal report and during trial, West Orange's expert acknowledged that a restaurant had historically been operated on the subject property and that he considered use of the property as a restaurant to be one of the "legally permitted alternate uses."[10] However, he observed that Rockpro, the former property owner and restaurant operator, "tore down the restaurant in favor of a new [CVS] retail pharmacy." Therefore, he reasoned that, although use of the subject property as a restaurant remained legally permissible, physically possible, and financially feasible, the owner's change in use reflected a reaction by the marketplace that operation of a restaurant was no longer the most maximally productive use.

In addition, during cross-examination, West Orange's expert offered that,

> as vacant land, I determined that a retail use was the highest and best use of the property. Again, there is no analysis prepared in my appraisal, it is based on an appraisal that I was preparing on the opposite corner of this property . . . [containing] a large retail shopping center with multiple tenants in it, restaurants, a supermarket . . . I was well-aware of the retail rents in that center, I found that those rents averaged between $25.00 and $40.00 a square foot, the rent for this store that I determined, was $42.50 a square

---

[9] West Orange's expert's appraisal report states in part that, "[i]n my opinion, the highest and best use of the subject property, as if vacant, is . . . retail development in accordance with the most permissive and maximally productive use under B-2 General Business District zoning. Please refer to the Zoning Section of this report for a tabulation of permitted, accessory and conditional uses allowed."

[10] West Orange's expert's appraisal report recites that "[t]he subject property was erected on the site of the former Pal's Cabin, a well[-]known restaurant owned and operated by the Horn Family since 1932."






foot, as improved, as a retail pharmacy, and that's what I concluded was its highest and best use, out of all the other uses on that were on page 31 that are permitted uses.

Thus, in performing his highest and best use, as vacant, analysis, West Orange's expert's review of market data and legally permitted uses yielded an economic rent as a retail pharmacy higher than the economic rent for general retail stores or restaurants in the area. Clearly, West Orange's appraisal report should have included the specific details and examples of his market analysis but neglected to do so. However, West Orange's expert's offered credible testimony that in conducting his highest and best use, as vacant, analysis, he examined facts and information derived from his personal investigations of the market, which is data customarily relied upon by property valuation experts. As stated by our Supreme Court, although an expert is never relieved from the obligation to fully document their opinion, "[i]n considering an expert's evidence a court should be cognizant of the expense incurred by litigants in engaging an expert. Therefore, the volume of information that is required to support an expert's opinion must be kept within practical and realistic limits." Glen Wall Assocs. v. Wall Twp., 99 N.J. 265, 280 (1985).

In addition, West Orange's expert's appraisal report further offered that,

> [t]he property is currently improved with a one story masonry and steel retail pharmacy building. The improvement was recently completed (2014) following application to and approvals from the Township of West Orange Zoning Board or Adjustment. The approvals were granted by the Zoning Board on May 23, 2013 and the new building was subsequently developed. Based on the foregoing, the existing use of the property is a legally permitted use. In as much as the improvements currently exist on the site, they are therefore regarded as physically possible and financially feasible. In my opinion, after consideration of legally permitted alternate uses, the existing retail pharmacy use is considered to be that use which is both maximally productive and which supports the highest possible value. Therefore, as improved, the existing retail pharmacy use is the highest and best use of the subject property.






In conducting his highest and best use, as improved, analysis West Orange's expert further testified that, "bearing in mind that I just finished an appraisal across the street of a large retail shopping center, and knowing what the rents were in there and knowing what they could get on this site, I determined that as . . . a retail pharmacy $42.50 was above what they could get over at the other site, so I accepted a retail pharmacy as the highest and best use as improved."

Based on the foregoing evidence and testimony elicited during trial, the court finds that, although not perfect, West Orange's expert's highest and best use conclusions were grounded in facts and data known by the expert when his appraisal report was prepared and prior to trial. The facts and data on which his opinions were premised resulted from the expert's research, analysis, and knowledge of similarly situated properties in the marketplace, personal observations, and data customarily relied upon by property valuation experts. The court is satisfied that in reaching his highest and best use conclusions, West Orange's expert analyzed and sequentially considered the subject property's legally permissible uses, physically possible uses, financially feasible uses, and maximally productive uses. In sum, West Orange's expert's highest and best use conclusions do not amount to net opinions.[11]

---

[11] During trial, CVS moved to strike West Orange's expert's testimony as a net opinion because his appraisal report did not detail the step-by-step analytical processes employed in reaching his highest and best use conclusions. The court denied the motion and placed a statement of reasons on the record. The court supplements its trial opinion with the following: When an expert's report is furnished during discovery, and the party adopts the statements contained therein as their own, they become binding discovery admissions, and "the expert's testimony at trial may be confined to the matters of opinion reflected in the report." Maurio v. Mereck Construction Co. Inc., 162 N.J. Super. 566, 569 (App. Div. 1978); see also Sallo v. Sabatino, 146 N.J. Super. 416, 418 (App. Div. 1976). However, an expert's report is not necessarily a statement of a party, and thus, "the testimony of an expert may not be limited to the content of his report simply because the report had been furnished in discovery." Skibinski v. Smith, 206 N.J. Super. 349, 353 (App. Div. 1985). "[T]he logical predicates for and conclusions from statements made in the [expert's] report are not foreclosed." McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 171 (App. Div. 1987). Importantly, in offering such testimony, the expert "may . . . be required to disclose the underlying






In addition, the court finds CVS' argument that West Orange's expert's highest and best use consideration of Walgreens as a "logical and probable" tenant in the subject property, as being too narrow and a net opinion, is also without merit. "The failure of an expert to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion. Rather, such an omission merely becomes a proper 'subject of exploration and cross-examination at a trial.'" Rosenberg, 352 N.J. Super. at 402 (internal citations omitted).

Here, West Orange's expert offered credible testimony regarding his highest and best use analysis and the considerations he embarked on in support of his opinions. Moreover, during cross-examination, CVS was afforded the opportunity to delve into how West Orange's expert arrived at his conclusions, including the market data and analysis performed. Simply because

---

facts or data on cross-examination." N.J.R.E. 705. Our courts have recognized that when experts have "not fully disclosed their theories in their reports, had they been deposed . . . , their depositions might have fully revealed the bases for their eventual testimony." Congiusti v. Ingersoll-Rand Co., Inc., 306 N.J. Super. 126, 131 (App. Div. 1997) (citing Mauro v. Owens-Corning Fiberglas Corp., 225 N.J. Super. 196, 206 (App. Div. 1988), aff'd sub nom., Mauro v. Raymark Indus., Inc., 116 N.J. 126 (1989)). However, in evaluating whether to permit such testimony, a trial court should consider, "(1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence." Ratner v. General Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990) (quoting Westphal v. Guarino, 163 N.J. Super. 139, 145-46 (App. Div.), aff'd o.b., 78 N.J. 308 (1978)). Here, the court finds that the testimony offered by West Orange's expert was a logical predicate of the data, information, and conclusions reached in his appraisal report. West Orange's expert's appraisal report recognized the historical restaurant operations on the subject property, the 2012 Ground Lease between Rockpro and CVS, and his "consideration of legally permitted alternate uses" for the subject property. Thus, CVS' attorney should not have been surprised, except as he did not depose West Orange's expert and, thus, was unaware of the fine details of West Orange's expert's highest and best use analysis. In addition, no evidence was adduced that West Orange's expert's appraisal report was designed to mislead CVS or that the admission of the testimony prejudiced CVS. CVS conducted a comprehensive cross-examination of West Orange's expert, disclosing the details of his highest and best use analysis and conclusions. Thus, CVS was not unduly prejudiced.






West Orange's expert arrived at the conclusion that Walgreens would be a "logical and probable" tenant in the event CVS vacated the subject property does not invariably lead to the conclusion that the expert did not consider other alternate highest and best uses, as improved. Cross-examination disclosed that West Orange's expert considered alternate uses of the subject property. However, due to its design, layout, and current development as a retail pharmacy, he concluded that it was most logical for another retail pharmacy to occupy the subject property in the event of a vacancy. Moreover, his testimony further revealed that his concluded economic or market rent for the subject property, as a retail pharmacy, exceeded the economic rent that could be attained under other legally permitted, physically possible, and financially feasible uses. Thus, his conclusion that Walgreens would be a "logical and probable" tenant in the event of a vacancy was adequately supported by his analysis of the zoning and marketplace.

 C. Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Borough, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).






Although West Orange's expert considered all three valuation methods, he concluded that the income capitalization and cost approach were best suited to derive an opinion of the subject property's true or fair market value. West Orange's expert primarily relied on the cost approach and employed the income capitalization approach "as a supporting indication of value."[12]

### 1. Income Capitalization Approach

When a property is income-producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, LLC v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). See Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 269 (1987) (concluding that "[t]he income method is generally preferred for assessing income-producing property"); TD Bank v. City of Hackensack, 28 N.J. Tax 363, 378 (Tax 2015); Shav Associates v. Middletown Twp., 11 N.J. Tax 569, 578 (Tax 1991).

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013).

Direct capitalization is a technique frequently employed by this court and valuation experts "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491;

---

[12] West Orange's expert used the comparable sales method to develop the estimated land value for the subject property under the cost approach.






Hull Junction Holding Corp., 16 N.J. Tax at 80-81. The capitalization rate is the device that converts a property's net operating income into an estimate of value.

### a. Market or Economic Rent

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010).

In performing his income capitalization approach, West Orange's expert identified five Walgreens retail pharmacy leases that he considered reflective of market rent. Each lease agreement was a "build-to-suit" lease arrangement, where the landlord/developer constructs a new building to match the tenant's requirements.[13] Typically, under a build-to-suit lease arrangement, the development costs associated with the construction are fully funded by the landlord/developer.[14]

In West Orange's expert's opinion, each lease reflected the market rent as of the October 1, 2014, October 1, 2015, October 1, 2016, October 1, 2017, and October 1, 2018 valuation dates. The leases bore commencement dates between January 2011 and June 2019. Notably, however,

---

[13] CREPedia.com defines build-to-suit as a "type of real estate transaction where a property owner or developer will construct a building for sale or lease that will be built to the tenant's or buyer's specifications." See https://www.crepedia.com/dictionary/definitions/build-to-suit/

[14] Each lease agreement relied on by West Orange's expert explicitly stated that "[t]he building [is] to be erected and completed by Landlord. . . ."






each of the five comparable leases contained an atypical provision that extends the lease term up to seventy-five years. The building size under each lease ranged from 12,361 to 14,963 square feet. The unadjusted rents for the five leases ranged from $40.79 to $51.62 per square foot.

West Orange's expert applied downward adjustments to each lease for perceived differences in building size, ranging from -3.15% to -7.28%. In West Orange's expert's opinion, because the subject property's building is slightly larger than the comparable leases (between 1,984 to 4,586 square feet), he applied a downward adjustment of 1.60%, per 1,008 square foot of building size difference.[15] The resulting range of adjusted rents was $39.28 to $48.12 per square foot. Based on the foregoing, West Orange's expert concluded an economic or market rent for the subject property of $42.50 per square foot, as of each valuation date involved herein.

Effective cross-examination disclosed that West Orange's expert did not speak with the brokers, or any transaction participants involved in any of the five lease transactions.[16] According to West Orange's expert, he "confirm[ed] the leases [with the brokers] that they're marketing as part of the property when they are selling it." Stated differently, West Orange's expert testified

---

[15] To compute his size adjustment factor, West Orange's expert analyzed lease 1 and lease 2. Despite the two retail pharmacy leases having been executed 18 months apart and the properties being in different municipalities and different counties, in West Orange's expert's opinion, the 1,008 square foot size difference between the two leases accounted for their $0.74 per square foot, or 1.60% rent differential.

[16] According to West Orange's expert, he did not speak with the landlord or tenant for any of his comparable leases. Specifically, West Orange's expert's testimony was: (i) for rental 1, "no sir, I didn't speak with the landlord or the tenant, I verified it with the lease and a lease summary [another appraiser prepared.]"; (ii) for rental 2, "no, sir" I did not speak with the landlord or the tenant in connection with this lease; (iii) for rental 3, "no sir, I didn't speak to the landlord or the tenant, I read the lease and a copy of [another appraiser's] printout of this lease comparable, but other than that, no sir"; (iv) for rental 4, "no sir, I did not [speak with any party to the transaction,] I confirmed this with the lease. . ."; and (v) for rental 5, "no sir, I did not [speak with any party to the transaction] . . . I verified it through the lease."






that he conferred with the brokers responsible for marketing the properties for sale after the leases were executed.

However, the court finds West Orange's expert's testimony on this issue lacks a measure of credibility. Based on the court's examination of the lease agreement, rental 1 was entered into between 1633 Springfield Avenue Associates, LLC, as landlord, and Walgreen Eastern Company, Inc., as tenant, on July 6, 2010. Yet, West Orange's expert reported that on December 31, 2010, approximately six months following the lease execution, the property was sold by S&B Enterprises, LLC to 1633 Springfield Avenue Associates, LLC. Thus, if the lease with Walgreens was executed with the contract purchaser, 1633 Springfield Avenue Associates, LLC, six months prior to its purchase, when and to whom did the listing broker allegedly market the property for sale after execution of the lease?[17]

Moreover, cross-examination further disclosed that no broker was engaged in the lease negotiation for rental 1 between 1633 Springfield Avenue Associates, LLC, and Walgreens. Thus, if West Orange's expert conferred with the broker responsible for marketing the property for sale from S&B Enterprises, LLC to 1633 Springfield Avenue Associates, LLC, it is wholly unclear what personal knowledge, information, or involvement that broker has, if any, of the lease negotiations and how the rent was structured under the lease agreement between 1633 Springfield Avenue Associates, LLC, and Walgreens.

Similarly, the court's review of the lease agreement for rental 3 discloses that it was entered into between Sound Short Hills, LLC, as landlord, and Walgreen Eastern Company, Inc., as tenant,

---

[17] The court finds it more probable that 1633 Springfield Avenue Associates, LLC first entered in a contract to purchase the property from S&B Enterprises, LLC, and then sought out prospective tenants to lease the property.






on September 22, 2014. Yet, West Orange's expert reported that the property was sold, in two transactions as part of an assemblage, by Michael and Virginia Bruno to Sound Short Hills, LLC on November 11, 2015; and by Farley Realty, LLC to Sound Short Hills, LLC on September 10, 2015, approximately twelve months following the lease execution. Thus, if the lease with Walgreens was entered in with the contract purchaser, Sound Short Hills, LLC, approximately twelve months prior to the sale, when and to whom did the brokers allegedly market the property for sale after execution of the lease?

Cross-examination further disclosed that no broker was involved in the lease negotiation between Sound Short Hills, LLC, and Walgreens. Thus, if West Orange's expert conferred with the brokers responsible for marketing the property for sale from the Brunos and Farley Realty, LLC to Sound Short Hills, LLC, it is wholly unclear what personal knowledge, information, or involvement that the brokers have of the lease negotiations and how the rent was structured under the lease agreement between Sound Short Hills, LLC, and Walgreens.

Further, the court's review of the lease agreement for rental 5 discloses that it was entered into between Win Belleville, LLC, as landlord, and Walgreen Eastern Company, Inc., as tenant, on February 4, 2016. Yet, West Orange's expert reported that John Resciniti, Jr. sold the property to Win Belleville, LLC on July 25, 2016, approximately five months following the lease execution. Thus, if the lease with Walgreens was executed with the contract purchaser, Win Belleville, LLC, five months prior to the sale, when and to whom did the broker allegedly market the property for sale after execution of the lease?

Cross-examination also disclosed that no broker was involved in the lease negotiation between Win Belleville, LLC, and Walgreens. Thus, if West Orange's expert conferred with the broker responsible for marketing the property for sale from John Resciniti, Jr. to Win Belleville,






LLC, it is wholly unclear what personal knowledge, information, or involvement that broker has of the lease negotiations and how the rent was structured under the lease agreement between Win Belleville, LLC, and Walgreens.

In addition, cross-examination further disclosed that neither of the two remaining leases, rental 2 and rental 4, were offered for lease or marketed for lease and that no broker was involved in any of the lease transactions.[18]  Thus, it is wholly unclear how Walgreens identified any of these properties and what, if any, relationship Walgreens may have had with the landlords, contract purchasers, or whether any creative structuring of the rental payments was involved in the negotiation of the leases.

Moreover, in deriving the capitalization rates to be applied to the net operating income under his reconstructed operating statements, West Orange's expert testified that he used a Band of Investment technique and relied on published capitalization rate data from Calkain Companies investor reports.  However, effective cross-examination disclosed that of the one hundred and twenty "Pharmacy" sector sales transactions and capitalization rates reported under the Calkain Companies investor studies, West Orange's expert was unable to identify the location of any reported sale transaction.  In sum, the data supporting West Orange's expert's concluded capitalization rates may involve real estate transactions in California or Texas and outside the competitive northeastern and mid-Atlantic regions of the United States.

---

[18]  During cross-examination, West Orange's expert acknowledged that paragraph 22 of rental 1 recites that "Landlord and Tenant represent that they have dealt with no broker or agent with respect to this Lease."  However, during cross-examination and before West Orange's expert could state whether similar provisions are contained under each comparable lease agreement, West Orange's counsel stipulated that he would accept CVS' counsel's representation that each comparable lease contains a similar provision.  The court's review disclosed that the lease agreements for rental 2, rental 3, rental 4, and rental 5, each contained similar provisions.




  b.    Analysis

In their post-trial closing submissions, West Orange and CVS each cite two unpublished

Tax Court decisions addressing the valuation of retail pharmacies in New Jersey, and the reliability

of build-to-suit lease agreements in establishing market or economic rent.[19][20]

Although the opinions serve no precedential value, they highlight the issues and pitfalls

that have plagued the courts in accepting build-to-suit lease agreement as evidence of market or

economic rent. Some of those considerations have included: (i) how the rental rate was arrived at;

(ii) whether the property was adequately exposed to the marketplace; (iii) whether the contract rent

represents a full or partial repayment of the development and construction costs; (iv) whether the

lease terms were comparable to and competitive with other retail leases in the marketplace; and

(v) whether the tenant was unusually motivated to enter the marketplace.

Here, although West Orange's expert possessed copies of each of the five comparable

leases, he was unfamiliar with any of the details surrounding the lease marketing, the lease

negotiation, and the lease execution, that are pivotal to the court. West Orange's expert: (i) offered

no evidence or testimony about how the contract rent was arrived at; (ii) did not know how these

properties were exposed to the marketplace; (iii) did not know if the contract rent represented a

full or partial reimbursement to the landlord/developer of any construction costs; and (iv) did not

---

[19] CVS principally relies on Walgreens E. Co. v. City of Linden, 2009 N.J. Tax Unpub. LEXIS 1 (Tax 2009), and West Orange principally relies on Rite Aid Corp. v. Borough of Roselle, 2017 N.J. Unpub. LEXIS 23 (Tax 2017). However, "no unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3.

[20] In addition, both West Orange and CVS highlight several court opinions issued across the country addressing the valuation of build-to-suit retail pharmacies in Wisconsin, Indiana, Connecticut, and Massachusetts. While these opinions decisions exemplify the conflict and struggles faced by trial courts, tax boards, and tribunals in attempting to determine retail pharmacies' true or fair market value, they bear no precedential value to this court. Accordingly, the court places no weight or reliance upon their holdings or conclusions.






know whether the lessee was unusually motivated to execute these leases. Further, because West Orange's expert did not speak with any of the lease transaction participants, he was unable to gauge whether the transactions reflected arm's-length market considerations, and gain meaningful insight into the motivations, if any, behind the transactions.

The court's review of the leases further discloses that each lease contains atypical lease provisions. Here, each lease relied on by West Orange's expert extends up to a seventy-five-year term. This court has regularly observed that such lengthy lease agreements are "hardly customary" in the marketplace. Center For Molecular Medicine and Immunology v. Belleville Twp., 357 N.J. Super. 41, 54 (App. Div. 2003); West Jersey Grove Camp Assocs. v. Vineland, 80 N.J. Super. 361, 366 (App. Div. 1963) (quoting Black v. Delaware & Raritan Canal Co., 24 N.J. Eq. 455, 465 (E. & A. 1873)) (concluding that "[f]or all substantial, practical purposes, a lease for nine hundred and ninety-nine years is a conveyance in fee"); Renaissance Plaza Associates, Ltd. Partnership v. Atlantic City, 18 N.J. Tax 342, 352 (Tax 1998) (concluding that the "ninety-nine-year lease with an option to purchase the property is a financing mechanism . . . ."). Although the leases being offered before the court by West Orange's expert are not for the court's review as to their "validity or for interpretation as to the rights or obligations of the parties *inter sese*, it is an exhibit in the case and is evidential of the intent of the parties and of the status of the property with respect to taxability." Jamouneau v. Div. of Tax Appeals, 2 N.J. 325, 329 (1949).

Moreover, excluding rental 4, the monthly rent under the four remaining lease agreements is fixed for the entire seventy-five-year term.[21] Thus, the monthly rent payable during the 1st month

---

[21] In addition to base rent, the lessees have an obligation to pay a percentage rent of gross sales. However, market or "economic rent for property tax appeal purposes may not be determined on the basis of a percentage of gross sales." Livingston Mall Corp. v. Livingston Twp., 15 N.J. Tax 505, 521 (Tax 1996) (citing Aetna Life Insurance Co. v. Newark, 10 N.J. 99 (1952)).






of each lease is the same as the rent payable during the 899th month of each lease. Accordingly, despite each lease agreement extending up to seventy-five-years only one of the lease agreements makes any provision for an increase or step-up in the fixed rent payable.

Thus, the court questions whether these build-to-suit agreements are more akin to fixed-rate mortgages, financing mechanisms, or a form of fee ownership rather than pure lease agreements. As stated by this court, when a lease agreement is longer than commercially normal terms, the interests of the "tenant" become more like the interests of an "owner." Renaissance Plaza Associates, Ltd., 18 N.J. Tax at 352-53.

"Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area." Parkview Village Assocs. v. Collingswood Borough, 62 N.J. 21, 29-30 (1972). As our Supreme Court keenly observed, "a taxpayer owning commercial property tied to a long[-]term lease made long before the current assessing date, . . . may well be out of line with current fair rental value." Id. at 35. Therefore, so too may lease agreements that represent financing mechanisms, mortgages, or an attempt to cast the lease as a form of structured fee ownership, be not reflective of current fair market rental values.

To ensure that a concluded market rent reflects the most probable rent that a retail pharmacy property would bring in a competitive and open market, it is important for the appraiser to examine not only build-to-suit retail pharmacy leases, but also to examine and analyze traditional retail pharmacy leases and reconcile the potential differences between them. However, West Orange's expert offered no analysis of other retail pharmacy leases in the marketplace. Thus, the court is unable to accurately gauge whether the five build-to-suit retail pharmacy leases are the outliers in the retail pharmacy market or whether they represent the typical market or economic






rents for retail pharmacy leases.

The weight to be accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates Inc., 2 N.J. Tax at 66 (internal citations omitted). Thus, for the opinion of an expert to be of any import, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). "Without explanation as to the basis, the opinion of the expert is entitled to little weight. . ." Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 458 (Tax 1980) (citing Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

Without having conferred with any of the lease transaction participants and conducted an in-depth examination and inquiry into the marketing, negotiation, and motivations of the parties in executing the leases, West Orange's expert's conclusion that these five build-to-suit lease agreements reflect market rent lacks credibility. Moreover, West Orange's expert's exclusive reliance on build-to-suit leases, without evidence of other retail pharmacy rents in the marketplace, leaves the court unable to accurately gauge whether the build-to-suit leases represent accurate evidence of market or economic rent in the subject property's competitive market area.

Accordingly, without credible evidence of economic or market rent, the court accords West Orange's expert's conclusions of value under the income capitalization approach no weight.[22]

---

[22] Because the court finds West Orange's expert's market or economic rent not to be credible, a discussion of West Orange's expert's vacancy and collection loss factor, stabilized expenses, and capitalization rates derived under the Band of Investment technique is unnecessary.






2.      Cost Approach

The cost approach derives a property's value "by adding the estimated value of the land to the current costs of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes." The Appraisal of Real Estate at 47. Thus, the cost approach consists of "two elements - land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 417 (Tax 2004).

a.      Replacement Cost

To generate the replacement cost new estimate for the subject property's pharmacy building, West Orange's expert used both the Core-Logic Marshall and Swift Computerized Commercial Cost Estimator ("Cost Estimator") and the Core-Logic Marshall and Swift Cost Manual ("Cost Manual"). However, West Orange's expert testified that he primarily relied on the Cost Manual "as an independent check on the . . . Cost Estimator." West Orange's expert further explained that he "accepted the Cost Manual valuations, the variations . . . range from 1.32% to 4.63% between the [Cost] Manual and the [Cost Estimator] . . . program."

To perform his cost approach, West Orange's expert separated the building into two components: (i) a 14,641 square foot drugstore, Class C, good type; and (ii) a 2,306 square foot retail mezzanine area, Class CDS, storage mezzanine type.[23]

After classifying the building's components and discerning the associated base unit costs, West Orange's expert applied height-story, perimeter, current cost, and local cost multipliers.

---

[23]   West Orange's expert also determined the replacement cost for the building's wet sprinkler system.

   

After applying the multipliers, West Orange's expert determined the replacement cost new for the building's 14,641 square feet, as of each valuation date. In addition, West Orange's expert applied current cost and local cost multipliers to the reported base cost for the mezzanine area to compute a replacement cost new for the 2,306 square foot mezzanine area as of each valuation date. Next, West Orange's expert added estimated costs for sitework, including, paving, landscaping, and construction of a trash enclosure, as of each valuation date. Finally, West Orange's expert added an entrepreneurial profit of 10% to the replacement cost new of the building and sitework.

West Orange's expert did not apply a depreciation or obsolescence factor to the subject property's building or sitework because, in his opinion, this is a "brand new building designed and constructed for use as a retail pharmacy, there is no obsolescence, no depreciation, brand new[,]" and that he "felt that it was in a new, good condition every year, as of every tax year."

West Orange's expert concluded a replacement cost new value for the subject property's building, including sitework, of: (i) $3,240,000, as of the October 1, 2014 valuation date; (ii) $3,295,000, as of the October 1, 2015 valuation date; (iii) $3,405,000, as of the October 1, 2016 valuation date; (iv) $3,420,000, as of the October 1, 2017 valuation date; and (v) $3,535,000, as of the October 1, 2018 valuation date.

b.  Land Value

To calculate the subject property's estimated land value, West Orange's expert identified four land sale transactions that he considered reflective of market value. Three of the land sale transactions involved the same properties that West Orange's expert relied on under his income-capitalization approach to value. The four sale transactions took place between December 2010 and February 2018 and involved property in: (i) Maplewood, Essex County; (ii) Millburn, Essex County; (iii) Belleville, Essex County; and (iv) West Orange, Essex County. Notably, land sale

   

two was the result of an assemblage of two lots.[24] In West Orange's expert's opinion, each land sale is comparable to the subject property as of each valuation date involved herein. The land sales range in size from 0.85 acres to 1.72 acres, and in unadjusted sale price from $43.26 to $130.68 per square foot, or $1,884,495 to $5,692,816 per acre.

West Orange's expert applied a -15% lot size adjustment to each land sale to account for the lot sizes being 22,160 to 59,893 square feet smaller than the subject property's lot. The resulting range of adjusted values were $36.77 to $111.08 per square foot, or $1,601,701 to $4,838,645 per acre. Ultimately, West Orange's expert concluded a $64.00 per square foot, or $2,787,840 per acre land value for the subject property, and total land value of $6,225,000 ($64.00 x 97,285 square feet = $6,226,240) during all tax years at issue.

West Orange's expert then added his concluded replacement cost new for the building, as of each valuation date, to his estimated land value. In sum, West Orange's expert concluded a value for the subject property under the cost approach of: (i) $9,465,000, as of the October 1, 2014 valuation date; (ii) $9,520,000, as of the October 1, 2015 valuation date; (iii) $9,630,000, as of the October 1, 2016 valuation date; (iv) $9,645,000, as of the October 1, 2017 valuation date; and (v) $9,760,000, as of the October 1, 2018 valuation date.

c.    Analysis

Although defendant argues that the subject property is more closely aligned with the "Retail Stores (353)" construction class category under the Cost Manual, the court finds West Orange's expert's classification of the subject property as a "Drug Store (511)," is more accurate.

---

[24] The first lot was conveyed on September 10, 2015, for reported consideration of $2,000,000; while the second lot was conveyed on November 11, 2015, for reported consideration of $1,650,000.






The Cost Manual defines "Drugstores" as "both the small neighborhood pharmacy and the large chain discount-type store with a variety of merchandise departments including convenience foods." Conversely, the Cost Manual defines "Retail stores," in a more generic fashion, as "buildings designed for retail sales and display . . . include stores occupied by so-called secondary or junior department stores with limited merchandise lines, specialty shops and commercial buildings designed for general occupancy."

Here, the subject property photographs reveal a stand-alone CVS pharmacy building containing a drive-thru window. The building interior is comprised of an open floorplan, containing numerous isles with a variety of merchandise and overhead department signs that include "Pharmacy," "Food," "Beverage," "Stationary," and "Beauty." In addition, the testimony and photographs disclose a designated pharmacy area containing a consultation counter, prescription counter, sinks, storage area, two prescription medicine pick-up areas, and a check-out area with several cashiers. Thus, the court finds West Orange's expert's selection of Drug Store (511), Class C, good condition, under the Cost Manual, to be reasonable and adequately supported by the evidence. Moreover, the court finds credible West Orange's expert's testimony, analysis, and computation of the replacement costs for the associated mezzanine storage area and the building's wet sprinkler system.

In addition, the court finds credible West Orange's expert's testimony that no depreciation factor should be applied to the subject property's improvements. Depreciation represents the market's recognition of the "loss[] in value of improvements due to the effects of age, wear and tear, and other causes. . . ." The Appraisal of Real Estate at 576. See Marina Dist. Dev. Co., LLC v. City of Atl. City, 27 N.J. Tax 469, 519 (Tax 2013) (concluding that depreciation is the "loss in value from three causes: physical depreciation, functional obsolescence and external economic






factors"). Published depreciation tables and mathematical formulas are available when attempting to measure or estimate depreciation (i.e., the age-life method). However, determining when depreciation is appropriate and the appropriate factor to be applied must be based on an appraiser's physical observations and interpretation of how "the market perceives the collective effect of all forms of depreciation." The Appraisal of Real Estate at 576.

West Orange's expert testified that the subject property is approximately one mile from his office and that he is a regular customer of the pharmacy, visiting it weekly. According to West Orange's expert, "there is no depreciation, no deterioration, no physical deterioration that I saw, even in the site improvements." Here, the subject property's improvements were completed in or about November 2014. Thus, the subject property's improvements ranged from being newly constructed to four years of age as of each valuation date. In sum, West Orange's expert offered uncontradicted testimony that, based on his personal examinations, the improvements suffered from no physical deterioration or perceived functional obsolescence, and no depreciation factor should be applied.

However, "[i]t is axiomatic that for purposes of local real estate taxation in the State of New Jersey, land and improvements are to be assessed at their total full value and not just the interest of either a lessor or a lessee." Merch. Mart Assocs. v. Pennsauken Twp., 3 N.J. Tax 275, 282 (Tax 1981) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)). In New Jersey, "[a]ll real property subject to assessment and taxation for local use shall be assessed according to the same standard of value, which shall be the true value of such real property. . . ." N.J.S.A. 54:4-2.25. That true value is "the fee simple interest. . . ." Harclay House v. East Orange City, 18 N.J. Tax 564, 569 (Tax 2000), aff'd, 344 N.J. Super. 296 (App. Div. 2002). See also Wolosky v. Freedon Twp., 31 N.J. Tax 373, 381 n.4 (Tax 2019) (concluding that "the objective of






the tax appeal was to determine the true value in the fee simple" interest).

By definition, a fee simple estate represents "absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by governmental powers of taxation, eminent domain, political power, and escheat." The Dictionary of Real Estate Appraisal at 78. Conversely, a leased fee interest represents the "ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." The Appraisal of Real Estate at 72.

Here, cross-examination of West Orange's expert disclosed that a lease agreement was signed as of the date of each of his four land sales, and development approvals were in place to construct either a Walgreens Pharmacy or a Chase Bank.

In West Orange's expert's opinion, the purchasers/developers in each of his four land sales would have purchased the land and paid the deed sales price without a lease agreement and development approvals in place. According to West Orange's expert, "the seller is not a developer, the seller is an owner of real estate, they put their property on the market, these people bought it, what they did with is their [the purchasers/developers] concern." In West Orange's expert's opinion, "I'm looking at what the seller got for his property, end of story. What the buyer was willing to pay for that property . . . he may have some motivation behind it, but the bottom line is that the seller agreed to sell it for x dollars, which is what I reported. I verified it with the seller, I verified it with the . . . deed, I'm satisfied that I've done my due diligence on the sale."

Although West Orange's expert testified that he verified with the sellers that the transactions were arms-length, he did not speak with the purchasers/developers or their representatives to gauge whether the agreed-to purchase price was impacted by the leases. Moreover, despite long-term lease agreements being in place on the date of each land sale, West






Orange's expert did not review or have access to the real estate contracts. Thus, he was unfamiliar with any atypical conditions, contingencies, terms, and/or provisions under the real estate contracts. Importantly, because he did not review the real estate contracts, he did not know whether each property's purchase price was manipulated, affected, or dictated by the rental income stream attributable to the Walgreens Pharmacy or Chase Bank leases.[25] Although West Orange's expert offered testimony that he confirmed with the seller or seller representatives that each land sale transaction was "arms-length," the court finds that a more thorough investigation was required to gain meaningful insight and an adequate understanding of how the leases, or provisions under the contracts making them contingent upon signing leases, may have impacted the negotiated sale prices.

For example, the purchasers/developers may have contracted with the seller and agreed to a certain stated consideration subject to and conditioned upon executing a lease generating a certain stream of revenue over a delineated period. In addition, the real estate contracts may have afforded the purchasers/developers the option to terminate the contract or to purchase the property at a reduced purchase price should those conditions or contingencies be unsatisfied. In sum, discussions with the purchasers/developers or a review of the contracts may have exposed that execution of the leases afforded the purchasers/developers an economic benefit or advantage in acquiring the properties based on the anticipated revenue stream to be generated under the leases. Admittedly, however, West Orange's expert did not speak with the purchasers/developers in any of his four land sale transactions to gauge whether the offers they extended to purchase the properties were impacted or influenced by the anticipated revenue stream.

---

[25] West Orange's expert acknowledged that the "rent, location, the quality of the tenancy" were all factors driving the sale price of the land sale one, two, and three.






The "sale price of a property encumbered by a lease involves rights other than the complete fee simple estate, and valuation of those rights requires knowledge of the terms of all leases and an understanding of the tenant or tenants occupying the premises." The Appraisal of Real Estate at 381. Thus, when relying upon the sale of a leased property as evidence of value, it is incumbent upon the appraiser to ensure that the rental income stream did not influence the property's purchase price.

It is well-settled that the sale of a leased fee interest does not necessarily reflect market value, "when analyzing a leased fee interest, it is essential that the appraiser analyze all of the economic benefits or disadvantages created by the lease." Int'l Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 423 (2004) (quoting Appraisal Institute, The Appraisal of Real Estate, 82 (12th ed. 2001.) The Appraisal of Real Estate further states the following with respect to leased fee and leasehold interests:

> The remaining term of a lease, the creditworthiness of the tenants, the influence of atypical lease clauses and stipulations, and other factors can affect the value of the sum of the parts, causing the sum to be less than or greater than the value of the fee simple estate.

> [Id. at 505.]

Here, the evidence disclosed that prior to the sale of West Orange's expert's land sales 1, 2, and 3, Walgreen Eastern Co., Inc. executed "build-to-suit" lease agreements with each purchaser/developer.[26] Significantly, the term of each of these Walgreens Pharmacy lease agreements extended up to seventy-five years.[27] In addition, although these lease agreements were

---

[26] Land sale 2 resulted from an assemblage. However, in West Orange's expert's opinion, no premium was paid for that property.
[27] West Orange's expert recognized the atypical nature of such provisions, emphasizing that the leases "could extend . . . to a total of seventy-five (75) years."




Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE



executed prior to the sales, the purchaser/developer under land sales 1, 2, and 3, assumed responsibility for undertaking the site improvements and constructing the retail pharmacy buildings following the sales.[28]

In addition, at or prior to the sale of land sale 4, JPMorgan Chase Bank executed a lease agreement with the purchaser/developer. The lease agreement between the purchaser/developer and JPMorgan Chase Bank extends for a term of up to forty years. However, West Orange's expert did not review or possess a copy of the lease and was unfamiliar with its terms or provisions. According to West Orange's expert, "I wasn't aware of the Memorandum of Lease . . . But I heard that there was a lease that was negotiated, but I thought that it was subsequent to the sale date."

The court questions the impact or role that the execution of these leases, the atypical term of the leases, and the rent payable under the leases played in the purchasers/developers' willingness to purchase these properties. Moreover, the court questions whether the contract price was influenced by the rent payable under the leases and whether the purchasers/developers' obligation to purchase each of the properties was contingent upon executing a lease at pre-established rental terms. In addition, the court questions whether the purchasers/developers were afforded the opportunity to terminate each of the real estate contracts or to acquire the properties at a lower purchase price if the leases were not executed. Finally, the court queries whether the four land sales purchase prices were impacted or affected by the tenant quality, here, being Walgreens and Chase Bank. In sum, the court questions whether the purchase prices of West Orange's expert's four land sale transactions represent the leased fee value or the fee simple interest in the

---

[28] A copy of the lease agreement for land sale 4 was not introduced during trial, only a copy of the recorded Memorandum of Lease.






properties.[29]

As expressed above, a property's value can be materially influenced by the leasehold interest, tenant quality, and the anticipated stream of rental income. Therefore, the purchase price of a leased property may not necessarily be a credible indicator of true value of its fee simple interest. Rather, the purchase price may reflect the purchasers right to above market rents, plus the reversionary right to the property after expiration of the lease. Because in local property tax proceedings the court must value the fee simple estate, it is incumbent upon the appraiser to carefully analyze and scrutinize each transaction and confirm that the purchase price and sale of a leased property is free from any financial advantages and drawbacks that may be created under the lease. Only after conducting such an analysis and being satisfied that the lease represents market rental rates, will the value of the sale of the leased fee interest equal the value of the fee simple interest.

Here, the court finds that West Orange failed to prove by a reasonable preponderance of the evidence that its expert's four land sales were not impacted or influenced by the leases, the anticipated revenue stream under the leases, or the quality of the tenancies. Therefore, for the above-stated reasons, the court finds that West Orange's expert's four land sales are not credible evidence of true or fair market value. Correspondingly, his concluded land value for the subject

---

[29] Cross-examination further disclosed that although the subject property sold on March 19, 2014, West Orange's expert did not rely on the land sale as evidence of market value because he characterized it as the "acquisition of the leased fee interest in the Ground Lease for the property dated March 13, 2012." However, the court observes that the subject property's March 19, 2014 sale bore many of the same characteristics as the land sales West Orange's expert relied on in arriving at his land value. Specifically, under each of the four land sales, the contract purchaser/developer did not acquire the property until approvals were in place, the contract purchaser/developer was responsible for constructing the improvements following the sale, and a long-term lease agreement was executed either prior to the conveyance or simultaneous with the conveyance.






property under the cost approach suffers from defects rendering it fatally flawed and not credible.

### 3. The Glen Wall dilemma

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Assocs., 99 N.J. at 280 (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax, 345, 353 (Tax 1981)). However, to enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record.

Consideration of West Orange's expert's testimony and appraisal report raises more questions and uncertainties regarding the comparable lease and sale transactions than the court has adequate and reliable answers. As detailed above, West Orange's expert did not speak with the brokers, or any transaction participants involved in the five leases that he relied on. Moreover, the properties were not offered for lease on the open market, and lease agreements were directly entered into between the proposed contract purchasers and the tenants. Although West Orange's expert offered testimony that he conferred with the brokers that marketed each property for sale, cross-examination disclosed that the brokers he conferred with were not involved in negotiating the leases and did not market the properties for sale after execution of the leases. Thus, West Orange's concluded economic, or market rent under the income capitalization approach was of no value.

In addition, although the court concluded that West Orange's expert's reproduction cost estimates were generally reliable, the court found that West Orange's expert's land sales were not reliable indicators of true or fair market value. The court determined that West Orange failed to demonstrate that the four land sales identified by its expert were not impacted or influenced by the leases, the anticipated revenue stream under the leases, or the quality of the tenancies. Thus, the






court questioned whether the sale prices accurately reflected the value of the fee simple estate or represented the value of the leased fee interests. Therefore, West Orange's expert's cost approach was of no value.

The court's independent determination of value must be based "on the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Morris Plains Borough, 100 N.J. 418, 430 (1985). The court concludes that based on West Orange's expert's testimony and appraisal report, the trial record contains insufficient credible data and information to enable the court to make a reliable, independent finding of the subject property's true value as of the October 1, 2014, October 1, 2015, October 1, 2016, October 1, 2017, and October 1, 2018 valuation dates.

## III. Conclusion

Accordingly, for the above stated reasons, the court will enter judgments affirming the 2015, 2016, 2017, 2018, and 2019 local property tax assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




